## MANIER v. THE STATE.

1. CRIMINAL LAW. *Involuntary manslaughter. What is not.* During an affray between the prisoner on one side and the deceased and another on the opposing side, the deceased was accidentally slain by some one co-operating with him, and by a blow aimed perhaps at the prisoner. *Held,* that the prisoner, under the circumstances, was not responsible for the act, and a conviction for voluntary manslaughter must be reversed.

2. SAME. *Charge of court. Must all be in writing, and must not refer to books for part of its matter.* A judge has no right to read from a book in delivering his charge, but his plain duty is to write, or have printed, which is within the meaning of the statute, every word, and then commit the charge to the jury upon their retirement.

---

FROM JACKSON.

---

Appeal from a judgment of the Circuit Court.

No record found.

SNEED, J., delivered the opinion of the court.

The prisoner was indicted for the murder of one Peter W. Neil. He was put upon his trial in the Circuit Court of Jackson county, convicted of voluntary manslaughter, and adjudged to suffer imprisonment in the penitentiary for six years. To reverse the judgment on this conviction, he has appealed in error.

As the proof impresses us, it would seem that the deceased was not slain by the prisoner, nor by any

one else with whom the prisoner was there and then combined to kill the deceased, or to do any other unlawful act. The theory of the case, as predicated upon the proof, is, that during an affray between the prisoner on one side, and the deceased and another on the other side, the deceased was accidentally slain by some one co-operating with him, and by a blow aimed perhaps at the prisoner. Who did the killing, however, we do not undertake to determine, as the case must go down for retrial, when the truth may be more satisfactorily developed. It is manifest upon this proof, however, that the prisoner did not strike the fatal blow; and the question is, whether, under the circumstances, he was properly convicted of manslaughter.

It appears that the prisoner and the deceased, with James and William Fuqua, Hugh Pheenis and Thos. Manier, on the evening of the 22d December, 1872, left the town of Granville in company to return to their homes in the country. They were neighbors, and there was no unfriendliness exhibited in the party, either while in the town or at any other time until a few minutes before the difficulty, which resulted in the death of one of them. It seems that most of the party were somewhat under the influence of liquor when they left the village; that they brought some liquor in bottles out of the town with them, and now and then resumed their potations on the road. The first indication of an unfriendly spirit was when the prisoner called upon deceased to treat, whereupon deceased made some harsh reply, and both for a mo-

ment seemed angry. Their companions, however, interfered and quieted the matter, and the two then drank together, and then the whole party went on their way. After proceeding a few hundred yards they met a colored boy with a small shot-gun in his hand. The weapon is described as a small, half-stock boy's gun, that could be fired in one's hand like a pistol. One of the witnesses states that the deceased first asked the boy to lend him the gun. The boy refused, stating, so that the crowd could hear it, that the gun was empty, and belonged to his brother. Others say that the prisoner asked for the gun, when the boy made the same reply, that the gun was empty, and declined to lend it. The prisoner, however, succeeded in getting the gun, at the moment of its delivery to him whispering to the boy something the witness did not hear. The boy also delivered to the prisoner his pouch of ammunition. It is stated, also, that at the moment of asking for the gun the prisoner told the boy he was about to have a difficulty; but this statement varies from that of the other witnesses. Upon procuring the gun the prisoner at once alighted from his horse, and remarking, "now I'm a man," snapped the gun twice at the deceased and James Fuqua, who were riding the same horse. Upon this, James Fuqua remarked that he was a man too, and he and deceased at once dismounted and advanced towards the prisoner for a fight. A stone was thrown by some one, which knocked down the prisoner and inflicted a severe wound on his face, and almost simultaneously the deceased was struck down with a stone

or some other weapon, from which blow he afterward died.

From the proof it is manifest, as already stated, that the prisoner did not strike the blow, and that neither of his adversaries received any blow or hurt from him in the course of the affray. It is very clear, on the contrary, that the blow by which the deceased came to his death was stricken by accident and came from his friend, and was aimed at his adversary, and the case was thus understood and treated upon the trial by the court and jury. There is some proof that the prisoner, on leaving home that day for the town of Granville, made some loose remarks as to his purpose to kill some one that day; but the witnesses who speak of this, say he was a jocose and mirthful man, much addicted to such braggart and foolish style of remarks. There is certainly nothing in the case that shows any settled malevolence toward the deceased prior to the transaction now in judgment.

As appropriate to this state of facts, the court charged the jury as follows:

"In this case it is insisted by the Attorney General that the defendant, at the time said Neil may have been killed, if killed by Fuqua, was engaged in an unlawful act, to-wit, committing an assault upon said Neil and James Fuqua, and that said assault had been brought on by the fault of said defendant. I will state to you, that if the defendant unlawfully commenced an assault on said Neil and Fuqua, and Fuqua, for the *bona fide* purpose of defending himself from an unlawful attack of defendant, threw a rock,

intending to hit and defend himself from defendant, and it by accident hit and killed said Neil, it would be a case of involuntary manslaughter in said defendant." And again : "If the defendant had committed such assault on Neil and Fuqua as made it necessary and proper for them to fight in their defense, and Fuqua, in making such defense, accidentally killed Neil, defendant would be responsible, and his crime would be involuntary manslaughter."

This. is not law, even as applied to the doctrine of involuntary manslaughter. But the jury, in the exercise of their right to judge of the law as well as the facts, have gone beyond the boundary between the two offenses of voluntary and involuntary manslaughter as defined by the court, and have pronounced the prisoner guilty of the higher degree of voluntary manslaughter. In cases of sudden mutual combat, without malice, it is generally only manslaughter when one of the parties is killed. It is involuntary manslaughter when there is a killing without the intent to inflict the injury; and it is voluntary manslaughter when there is a killing with concurring will and deed to inflict the injury which produces death. But in either there must be a killing directly or indirectly by the party charged, by some instrumentality or agency set on foot by him, or by some other person with whom he is in complicity as aider or abettor. If one be engaged in an unlawful act, and he or his friend and confederate therein strike a blow with no intent to kill, and does kill, then both may be guilty of involuntary manslaughter. But if, during the pros-

ecution of such unlawful act, a stranger to the unlawful common purpose, having no connection therewith, by reckless incaution, by accident or misadventure, kill a man, then such killing is not the necessary, natural or reasonable consequence of said original unlawful act, and the guilt of homicide cannot lawfully be imputed to the actors in said original unlawful act. In our researches we can find no case presenting this precise phase of the doctrine of homicide, but we have no difficulty in the solution of the question, upon the cardinal principle that in every unlawful homicide the killing must be done by the party charged, or by another in complicity with him, or it must be the natural and reasonable sequence of some unlawful or negligent act in which the party accused is at the time employed. It would be a monstrous doctrine to hold that when a party intended to kill but did not kill, and a party with whom the first was in no complicity, accidentally or recklessly kills the adversary of the first party, that the latter should suffer the consequences of such reckless or casual act. And how could such a doctrine be supported, when there is no such intent at all? The general proposition is undoubtedly correct, that if an involuntary killing happens in consequence of an unlawful act, it will be murder or manslaughter according to the nature of the act which occasioned it. If it be in prosecution of a felonious intent, or in its consequences naturally tended to bloodshed, it will be murder, and if no more was intended than a civil trespass, it will amount to manslaughter; or, if a man does such an act, of

which the probable consequence may be, and eventually is, death, such killing may be murder, although no stroke be struck by himself, and no killing be primarily intended. These principles are elementary. 2 Cool. Bl., 213, 215. But in all these cases the act must proceed directly or indirectly from the accused himself, and the examples of the ancient books very well illustrate the principle. Thus, the case of the unnatural son who exposed his sick father to the air against his will, by reason whereof he died; or of the harlot who hid her child under leaves in an orchard, when a kite struck it and killed it; or of the parish officer, who shifted a child from parish to parish till it died from want of care and sustenance; or of a man that hath a beast that is used to do mischief, and he, knowing it, suffers it to go about, and it kills a man; even this was held manslaughter at common law. But if he had purposely turned it loose, though barely to frighten people, it is, according to the English common law, says Blackstone, as much murder as if he had incited a bear or dog to worry them. Id., 416. It will be observed, that in all these cases the death proceeded mediately or immediately from the party accused, and not from the accident or incaution of another with whom he had no connection in the unlawful or negligent act. In the case of Seats v. The State, 5 Jones (N. C. Rep.), 423, it was held that a person who had inflicted a mortal blow cannot be convicted of homicide if the wounded man were in fact subsequently killed by another having no understanding or connection with him.

Judge Battle, in discussing that case, said the act of killing and the intent must concur. An attempt only to kill, with the most diabolical intent, may be mora but cannot be legal murder. If one man inflicts a mortal wound, of which the victim is languishing, and then a second party kills the deceased by an independent act, we cannot imagine how the first can be said to have killed him, without involving the absurdity of saying that the deceased was killed twice. *Id.*, 424. And so, in the case now in judgment, if Peter W. Neil was actually slain by his own friend, as the facts indicate, and the prisoner, having no complicity with the slayer, is convicted of the homicide, we are involved in the absurdity of holding, in order to sustain this conviction, that Peter W. Neil was killed twice, by two different persons, having no sort of complicity or connection in the act of killing. "Nothing is law," said Sir John Powell, "that is not reason," and we cannot commit the law to such a doctrine.

Other questions are presented in this case, but one of which we deem it necessary to notice. The Judge, in delivering his elaborate and generally able charge, reduced the same to writing, as required by the statute, and read it to the jury, who took it with them for consideration in their retirement. It is urged as reversible error, that the Judge, in submitting said charge, read several sections of the Code defining the different grades of homicide, and that these sections f the Code thus read were not incorporated in the written charge or taken by the jury into their retire-

ment.    Upon a careful review of the charge, we find that these definitions as given by statute are not as fully given in the charge as they are embodied in the statute, though they are partially so.    The statute on this subject has lately been considered in a case at Knoxville, and its provisions were held to be imperative and not merely directory.    The 2d section of the act of 1873, ch. 57, is in these words:    "On the trial of all felonies, every word of the judge's charge shall be reduced to writing before given to the jury, and no part of it whatever shall be delivered orally in any such case, but shall be delivered wholly in writing.    Every word of the charge shall be written, and read from the writing, which shall be filed with the papers, and the jury shall take it out with them upon their retirement."    It is very manifest from the clear and emphatic terms of this statute the Legislature did not intend to leave anything for judicial construction, but intended to be understood.    We cannot weaken its force by any strained construction, and would not be disposed to connive at a judicial repeal or modification of its provisions if we could do so.    We hold that the Judge had no right to read from any book in delivering his charge, but his plain duty was to write or have printed (which we hold to be within the meaning of the statute) every word, and then commit the charge to the jury upon their retirement.    The strict observance of this wholesome statute cannot but be beneficial to the public and to the criminal jurisprudence of the State.    It was intended to secure to the prisoner and

the State a sound exposition of the law, upon careful thought, and to prevent the evil of repeated re-trials, with all their attendant burthens of expense and inconvenience, which have resulted from the errors committed in hasty, extemporaneous charges; and it was also intended to expedite the trial of criminal causes, by putting an end to disputation among the jurors as to what the oral charge was, and their frequent return into court to be recharged on points not remembered or comprehended by all; and it is at last but a necessary provision in order that the jury, who are the props of the law, may the better understand the law. The statute admits of no evasion, and its terms are imperative.

Reverse the judgment and award a new trial to the prisoner.