## NELSON *v.* THE STATE.

CRIMINAL LAW. *Voluntary manslaughter. Shooting with a wad not. When.* The prisoner was shooting a small pistol about the house where the deceased resided on the 25th of December—he was shooting "Christmas guns." The prisoner finally went into the house and said to one of the inmates that if the deceased did not kiss him he would kill her. He then loaded his pistol and went into the deceased's room, and told her if she did not kiss him he would shoot her. He then put his arms around her and the pistol went off, killing the deceased. The pistol was not loaded with a leaden ball, and all the parties were friendly. The prisoner expressed great astonishment at killing the deceased. The court believing that the killing was done unintentionally, hold that the facts do not constitute voluntary manslaughter, but refrains

Nelson *v.* The State.

from expressing any opinion as to the offense being involuntary manslaughter.

Cases cited: Morley *v.* The State, 1 Sneed, 407; Lee *v.* The State, 1 Cold., 62–67.

FROM SHELBY.

No record to be found.

McFARLAND, J., delivered the opinion of the court.

The prisoner was tried upon an indictment for the murder of Milley Ford, and convicted of voluntary manslaughter and sentenced to five years imprisonment in the penitentiary, and this motion for a new trial being refused he has appealed in error.

The proof of the witnesses as set out in the bill of exceptions shows that the prisoner, on the 25th of December last, had been shooting a small pistol about the yard at the house where the deceased resided in Memphis—shooting Christmas guns.

Harriet Faim, who lived in the same house with the deceased, says: "He," meaning the prisoner, "came into my room just after he had shot once and loaded his pistol, and while in my room loading his pistol, said that he intended to go into Milley's room and shoot or kill her unless she would kiss or hug him. When he loaded his pistol he then went into Milley's room, and I heard him say kiss me Milley, or I want you to kiss me. She answered, I won't do it; go away from me George. She then heard the pistol fire."

Henry Thomas, who was in the room with the de-

ceased, says; "George Nelson came into the room with the pistol in his hands; he went up to Milley and said: Milley, I want you to hug me, or I want you to kiss me. She said I won't do it. He then said if you don't do it I will shoot you. He then put both arms around her, and as he did so, the pistol fired. . . . As the pistol fired, she fell over into George's arms, and sank to the floor. George said, "for God's sake forgive me, Milley; I didn't think it would hurt you." He said to me, "go, Henry, and bring the doctor; please go, Henry, quick!"

The statement of this witness is corroborated by other witnesses. The proof makes it most probable that the pistol was not loaded with a ·bullet, but with a paper or other "wad." The wound was in the back, below the shoulder, the orifice ranging back to the spine. The parties had been entirely friendly previous to that time. Without setting out the evidence in detail, we think it fails to show any purpose to take the life of the deceased, or to inflict any injury upon her. We understand the threat to shoot or kill the deceased to have been a jest, or at least the shooting he did not intend to be of a dangerous character. This was the understanding by the witnesses, for they evidently did not think at the time that any thing dangerous was intended.

The evidence may support the conclusion that the prisoner fired the pistol purposely, but upon this record we think if he did so, it was for the purpose of frightening the deceased, or practicing what he intended as a joke, probably not knowing that a dangerous

wound might be inflicted without a leaden bullet or shot. His entire conduct, we think, with the attending circumstances, establishes this conclusion. Taking this view of the facts, is it a case of voluntary manslaughter?

Our statute, which in this respect is the substance of the common law, defines manslaughter thus: "Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat or involuntary, but in the commission of some unlawful act."

The most common cases of voluntary manslaughter is where two persons, upon a sudden quarrel, fight, and one kill the other: *Marley* v. *The State,* 1 Sneed, 407. Our statute makes two separate grades of felony of manslaughter, and affixes different punishments. In *Lee* v. *The State,* 1 Cold., 62–67, involuntary manslaughter is defined to be "where it plainly appears that neither death or any bodily harm was intended, but death is accidentally caused by some unlawful act, or any act not strictly unlawful in itself, but done in an unlawful manner and without due caution."

We are of opinion that neither death or bodily harm was intended, and the proof does not sustain a conviction for voluntary manslaughter. The question whether he is guilty of involuntary manslaughter is not before us.

Let the judgment be reversed and a new trial be awarded.