Draper *v.* The State.

DAVID H. DRAPER *v.* THE STATE.

1. PRESUMPTIONS OF LAW. Every man is presumed to be innocent until his guilt is legally made to appear; but when a homicide is clearly proven, and the slayer ascertained, and nothing else appears, the killing is presumed to be criminal, as every person is presumed to intend the usual and natural consequences of his acts.

Case cited: Wilhite *v.* The State. MSS.

2. SELF-DEFENCE. To excuse homicide the danger to life, or of great bodily harm, must be real, or honestly believed to be so at the time, and on reasonable grounds; the danger must be apparent and imminent and existing at the very time, or believed to be so, and on reasonable grounds.

Cases cited: Rippy *v.* The State, 2 Head, 218; Williams *v.* The State, 3 Heisk., 394.

3. OBJECTION TO JURORS. *Propter defectum.* *When to be taken.* Objection to a juror *propter defectum*, must be taken before the swearing of the jury, although the prisoner is ignorant of the disqualification.

Cases cited: McClure *v.* The State, 1 Yerg., 206; Gillespie *v.* The State, 8 Yerg., 507; Calhoun *v.* The State, 4 Hum., 477; Ward *v.* The State, 1 Hum., 259; Brakefield *v.* The State, 1 Sneed, 219.

Authority cited: 1 Arch., 163-4.

4. EVIDENCE. *Sufficiency of.* As to what facts will make out a case of guilt of manslaughter beyond a reasonable doubt. See the latter portion of the opinion of the Court.

FROM FRANKLIN.

Appeal from the Circuit Court. SAMUEL F. FITE, Judge.

JORDAN STOKES and R. A. COX for Draper.

ATTORNEY–GENERAL HEISKELL for the State.

DEADERICK, J., delivered the opinion of the Court.

Draper *v.* The State.

The plaintiff in error was convicted of manslaughter and sentenced to two years imprisonment in the Penitentiary, at the January Term, 1875, of the Circuit Court of Jackson County.

A new trial was refused, and he has appealed to this Court.

Several errors, it is alleged, were committed in the progress of the trial below, for which, it is insisted, the judgment should be reversed, and a new trial granted.

1. Exception is taken to the first paragraph of the Judge's charge. After stating the offence charged, and that defendant had pleaded not guilty, he continues by stating to the jury that "every man is presumed to be innocent, untill his guilt is legally made to appear; but when a homicide is clearly proven, and the slayer ascertained, and nothing else appears, the killing is presumed to be criminal, as every person is presumed to intend the usual and natural consequences of his acts."

The objection taken to this part of the charge is two-fold.

1. That, as the proof showed the facts and circumstances of the killing, the law did not presume anything.

2. That that part of the charge which instructed the jury, that, "where the homicide is clearly proven, and the slayer ascertained, and nothing else appears, the killing is presumed to be criminal," etc., was ob-

viously intended to counterbalance and overcome the presumption of innocence, fixing in the minds of the jury, at the start, a presumption of guilt.

There is nothing in either objection. The defendant, in the beginning of the investigation, starts out with the presumption of innocence in his favor. When he is shown to have committed the homicide, and nothing else appears, that presumption is removed. Such is the legal effect of the proof of the homicide, and that defendant was the slayer.

Similar objections were taken to the charge of the Court, which was in almost the identical language with that employed in this case, in the case of *Wilhite* v. *The State*, decided at December Term, 1872, of this Court. In that case it was held, that, there was no error in the charge, and that where the killing was proved and the slayer was identified, the presumption is, that the killing was criminal, but that these facts, nothing else appearing in evidence, did not raise the presumption that the killing amounted to murder in the first degree.

The conclusion of the paragraph, that the "killing is presumed" to be criminal, "as every man is presumed to intend the usual and natural consequences of his acts," has also been criticised as uncalled for, and irrelevant, and calculated to prejudice the defendant. The propositions are both sound law, and in the connection in which the latter part of the paragraph occurs, while it might have been omitted without impairing the force of the principle announced, we

do not see that it can or does qualify it to the prejudice of defendant.

2. It is next insisted, that the Judge erred in his definition of the offence of manslaughter.

In the beginning of the charge, his Honor, the Circuit Judge, fully and accurately defined the several grades of homicide, first distinguishing between murder in the first and murder in the second degree. When he defines manslaughter to be "the unlawful killing of another, without malice, either expressed or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act;" and he further instructed the jury as to the punishment of these several offences.

It is not controverted, that the above definition of manslaughter, is correct, but it is insisted, that, in other parts of the charge, in directing the attention of the jury to the distinctions between murder and manslaughter, he inaccurately defines the latter. The definition already given was read to the jury from the Code, §4603, as were the other provisions of the Code upon the definition and degrees of homicide. The Judge then proceeded to explain the meaning of the terms used in defining the degrees of murder, and of manslaughter. And recurring to the definition previously given by him, of the offence of murder in the first degree, he explains, correctly, the meaning of the words successively used in defining said offence, and, by way of illustrating the differences between murder in the first degree, and murder in the second

degree, and also between murder in the second degree and voluntary manslaughter, the Judge said to the jury, that, "if the killing was unlawful, wilful and malicious, though not deliberate and premeditated, it would be murder in the second degree. If done on a sudden heat of passion, without malice, it would be voluntary manslaughter."

The objection is, that the foregoing is an incomplete, and, therefore, inaccurate definition of the offence of manslaughter.

It was not given or intended as a full and accurate definition of the offence, that had been given just before in the language of the Code, but the purpose of the Court in the part of the charge criticized, was to enable the jury, by stating some of the distinguishing features of the offence, to enable them to discriminate between them.

Thus, killing " on a sudden heat of passion, without malice," distinguishes voluntary manslaughter from murder in the second degree, and this distinction is further illustrated in the same connection, by the example of two persons upon a sudden quarrel, fighting, and one killing the other.

In view, therefore, of the fact, that every grade of homicide had been, in the beginning of the charge, and just before that part excepted to, fully defined and elaborately explained, we do not think that the subsequent parts of the charge which have been objected to, were erroneous, or in any degree calculated to mislead the jury, or to the prejudice of defendant.

It is also objected, that the Circuit Judge did not correctly state the law of self-defence.

The charge is, that, " to excuse the homicide, the danger to life, or of great bodily harm, must be real or honestly believed to be so at the time, and on reasonable grounds; the danger must be apparent and imminent and existing, at the very time, or believed to be so, and on reasonable grounds," " the belief or apprehension of danger must be founded on sufficient circumstances to authorize the opinion, that the deadly purpose to do great bodily harm then exists, and the real fear that it will, at that time, be executed."

The objection to this part of the charge is, that the jury is instructed, that, to excuse the killing, the danger must exist, or be really apprehended at the very time, or at the moment when the fatal blow is given; and deprives him of this defence, " if the danger or apprehension existed a moment before, or after the fatal blow was given," but did not, in fact, exist at the very time when the blow was given.

The law of self-defence is founded upon the inherent right of self-protection. To preserve his life or protect himself from great bodily harm, a party assailed may, if necessary to this end, or honestly believed to be, on reasonable grounds, carry this right to the extent of taking the life of his assailant. But to excuse him, the danger must be imminent and impending, manifested " by some words or overt acts at the time clearly indicative of a present purpose to do the injury;" 2 Head, 218.

And this "fear of death* or great bodily harm,"
"must be really entertained, and the act done, under
an honest and well-founded belief that it is absolutely
necessary to kill at that moment, to save himself from
a like injury." *Ibid.*

The case of *Rippy* v. *The State,* 2 Head, 218, is
cited and approved in the case of *Williams* v. *The State,*
3 Heisk., 394, where it is held, that, "to make out
the case of self-defence, it must be shown that de-
fendant did really entertain the fear of death, or great
bodily harm, at the time he fired the gun and did
the killing, that he did shoot under an honest and
well-founded belief that it was absolutely necessary
for him to kill the deceased at that moment to save
himself from a like injury."

If defendant had no such apprehension at the very
time at which the blow was given that produced the
death, of course, there is nothing upon which the
excuse of self-defence can rest. The existence of a
reasonable apprehension of danger, is the sole ground
upon which the defence can rest, and if it does not
exist at the time of doing of the act, the act itself
cannot be excused.

The charge, therefore, was not erroneous, in respect
to the law of self-defence.

After the verdict was rendered, Irvin West, one of
the jurors, was examined by the defendant in open
Court upon the motion for a new trial, and testified
that he married the daughter of a widow, in said
county of Jackson, and lived with his mother-in-law,

and she was about to remove and let him remain in the house, but he had not determined whether he would remain on her place or rent land elsewhere. That he owned no land in said county.

Defendant made affidavit that West was neither a freeholder nor householder of Jackson County, and, if he had known the fact, he would not have taken him on the jury.

It does not appear what answers were made by the juror, upon his preliminary examination. The presumption is, that he did not disqualify himself as a juror by his answer. Probably he supposed himself competent, and so answered.

In the case of *McClure* v. *The State,* 1 Yer., 206, it was decided, that, objection to a juror, *propter defectum,* as in this case, must be taken before the swearing of the jury, although the prisoner is ignorant of the disqualification. To the same effect, are the later cases of *Gillespie* v. *The State,* 8 Yerg., 507, *Ward* v. *The State,* 1 Hum., 259, and *Calhoun* v. *The State,* 4 Hum, 477; see, also, 1 Arch., 163–4.

Where, however, a juror has prejudged the case, a different rule prevails, and a new trial will be granted for such cause; *Brakefield* v. *The State,* 1 Sneed, 219.

The defendant, upon the trial, introduced Polly White, a witness, who testified, that Napoleon Richmond, a son of the deceased, was sent for soon after his father was struck the fatal blow, and when he came, that his father stated to him, " I want you to stay with me now, and when I get well, we will fix

it all up. It was not me and Dave, it was whisky."
Napoleon Richmond testified, that no such conversa-
tion by his father was had, as that stated by Polly
White, and that his father did " ask him to take care
of his little children."

This testimony, as to what the deceased did say,
was objected to, and the objection was overruled. It
was, perhaps, not strictly admissible, but was not of a
character to do any damage to the defendant. It
was not an error of such character as to authorize a
reversal.

It is argued, that the facts presented in the record
do not make a case of guilt beyond reasonable doubt.

Richmond and Draper were near neighbors, and,
when sober, were peaceable, orderly men; when drink-
ing, the testimony is, that deceased was turbulent and
quarrelsome. They had been drinking together all
the day of the homicide, and, about sundown, rode up
to the house of Huffhine, not far from where they
themselves lived. Draper proposed to Richmond to
light, and get something to drink. Richmond at first
declined, but finally consented. Draper helped him off
his horse; both were intoxicated—Richmond, perhaps,
more so than Draper. They entered the porch and
seated themselves. A little boy six or seven years
old, son of Herring, the son-in-law of Huffhine, who
lived in the house with his father-in-law, was sitting
in a chair in the porch, and Richmond rudely pulled
him out of the chair by his feet, and his head and
back struck the floor. Herring remonstrated with him

for his rudeness, and Draper said, speaking to deceased, "Frank, if you are going to do that way about a clever man's house, let's go home." Richmond then asked Draper if he took it up, with an oath, adding, that "he feared no man." Draper said no, he did not take it up.

Herring then interposed, to prevent a quarrel, and supper being announced, invited both to supper. They declined to go in to supper. Herring and the family then went off to their supper, and while at supper he heard them "jowering," and heard Richmond say "you have said something you will have to take back," and heard one of them say, "let's go out and fight." Herring then left the supper-table and went out into the porch, and as he entered the porch, they were up, and Draper was going towards the door, and Richmond was following. As Draper went out, Richmond kicked him two or three times lightly, Richmond following to the door of the porch. He stood there, with his hand on the post of the door. Draper stood leaning on the railing of the piazza about half a minute, perhaps not so long, then walked slowly four or five steps from the door, where there was an axe lying, picked up the axe, and turned with it in his hands. Richmond was still standing in the porch door. Draper came back in a rush, saying, "give back Frank, I am coming," and struck Richmond with the blade of the axe over the right eye, and Richmond fell back on the floor of the porch. Draper started in with the axe, and Herring told him not to strike any more,

and he dropped the axe, saying, "I don't reckon he will call me a coward any more." After standing around awhile, Draper asked Herring if Richmond was much hurt, and being told that he was, remarked "I had better leave," and got on his horse and left. "Richmond died of this wound on the fourth day afterwards." Such are the material facts of the case, as testified to by Herring.

Deceased had no arms at the time he was struck, unless he had in his hand a barlow knife, which · was found open near him, upon the floor, after the difficulty. This knife was identified as belonging to him.

Upon the foregoing facts, which are not contradicted in any material particular, by any testimony in the record, we think it is very· clear that Draper was in no danger of serious bodily harm, and that he did not apprehend any danger at the time he struck the fatal blow. After he left the door of the porch, deceased did not follow him; he had passed beyond his reach, and he made no attempt to follow up the assault. Draper paused, leaning upon the railing of the porch, and, after that, turned and walked slowly to the place where the axe was lying, picked it up and turned toward deceased, exclaiming, "give back, Frank, I'm coming," rushed upon him and dealt the fatal blow. During all this time, deceased stood at the same place he occupied when Draper went out of the door, and made no attempt or offer to assault him, or to pursue, up to the moment of receiving his death-blow.

This case presents a sad picture of distress, brought upon the families of two neighbors, by their own misconduct. It is shown in the record, by the testimony of those who have known them both for many years, that they were good and peaceable citizens when sober. But by drunkenness, one has been prematurely consigned to the grave. Upon the other, it is our painful duty to pronounce a felon's doom.

There being no error in the record for which the judgment of the Circuit Court should be reversed the same is affirmed.