ROGERS v. STATE.

(*Knoxville.* October 16, 1895.)

1. MURDER. *Evidence.*
   The opinion recites facts that are held sufficient to support verdict for murder in the second degree. (*Post, pp. 448–454.*)

2. SELF-DEFENSE. *Cannot be invoked by a party in fault.*
   A defendant cannot invoke the law of self-defense for his protection, where, after provoking a quarrel, he retires to a place of safety and arms himself with a gun, and returns and provokes a demonstration from the deceased and shoots him. (*Post, pp. 453, 454.*)

FROM HAMBLEN.

Appeal in error from Circuit Court of Hamblen County. W. R. HICKS, Judge.

JAS. G. ROSE, SHIELDS & MOUNTCASTLE, and J. B. HOLLOWAY for Rogers.

Attorney-general PICKLE, NAT. B. JONES, FRANK LAFFERTY, and W. S. DICKSON for State.

MCALISTER, J. The plaintiff in error was indicted in the Circuit Court of Hamblen County for the killing of one John Scott, and at the December Term, 1894, of said Court he was found guilty of

murder in the second degree, and his punishment fixed at confinement in the State prison for a term of ten years. This is the second conviction of the defendant. On a former trial he was found guilty of murder in the second degree, and sentenced to the penitentiary for a term of twenty years. On appeal to this Court, at the last term, the judgment was reversed.

It appears from the record that at the time of the killing the prisoner and the deceased lived on adjoining farms. The Scott family consisted of the deceased, his wife, and mother. The killing occurred on the defendant's premises, in the presence of both families, and originated in a family quarrel about a cow.

On August 11, 1893, the defendant, finding this cow in his cornfield, turned her out and drove her to the Scott residence, for the purpose, as he claims, of getting them to keep her up. Defendant was on horseback at the time, and, stopping on the road in front of the Scott residence, he called several times. Failing to get any response, the defendant drove the cow on to his own premises, and put her up in his barn. It appears that when Rogers passed the Scott residence with the cow, the deceased and his wife were in an upper front room. The wife of deceased heard the defendant, and saw him in the road with the cow, and called her husband's attention to the fact. The deceased immediately started out after the cow, and when he had pro-

29—11 p

ceeded as far as the barn his wife and mother went after him, and persuaded him to come back to the house. The two women, however, followed the defendant, who was driving the cow in the direction of his own premises.

When the women reached the defendant's premises, ne had put the cow up in his barn, and had gone on to the house. The women stopped in the public road, in front of defendant's house, between the house and barn. It appears from the evidence of the women that when the defendant discovered their presence he invited them to come into the house, remarking that he wanted to see John's new wife, but they declined the invitation, saying they were not dressed for calling. The defendant then sent his wife and daughter out, who renewed the invitation, but it was again declined. It appears, however, that the meeting between these ladies was entirely cordial, the record disclosing that the wife of defendant and the elder Mrs. Scott kissed each other. About this time the deceased, who had left his home and followed his wife and mother, also arrived. The defendant, Rogers, likewise invited the deceased into his house, but the deceased stated that he did not have time. The defendant then came down to the road where the Scotts were standing.

Up to this time there had been no unfriendly words or hostile demonstrations on either side. The defendant seemed friendly towards the Scotts, at least his manner and treatment of them had been

courteous. About this time the elder Mrs. Scott remarked to the defendant: "We want to get our cow." The defendant replied: "You can have the cow, but you must keep her out of my corn." He then crossed the road to the barnyard gate, ostensibly for the purpose of turning the cow out. The elder Mrs. Scott remarked: "I don't think our cow has eaten any more of your corn this year than your mules eat of our corn last year." Defendant replied: "I don't want to talk foolishness. If you want a fuss you can have it."

The defendant then suddenly turned back, crossed the road to his house, procured a shotgun, and came back as far as the platform bridge across a little ditch, where he stopped. The deceased still remained standing, with his left hand on the fence, and his right hand in his right pants pocket. With the parties in this position, the defendant said to the deceased: "Take your hand out of your pocket." This command was repeated three times. The deceased, according to the testimony of the State's witnesses, made no response, and remained perfectly motionless. The wife of deceased testifies that the first time defendant told deceased to take his hand out of his pocket, the command was spoken in a mild tone of voice, but the second and third time the command was spoken in louder tones; that, at the third command, defendant raised his gun to his shoulder and fired. The deceased staggered off several steps, fell on his knees, and expired.

The testimony of the State is that deceased, prior to the shooting, made no demonstration of any kind, but stood, with his hand in his pocket, and said nothing.    After he was shot, he made two or three efforts to draw his pistol, but did not succeed.    His wife went to him, and removed his pistol from his right pants pocket, and handed it to her mother-in-law, who carried it off.

The defendant testified in his own behalf, and, in respect of the immediate facts of the killing, stated, viz.: That, "after the Scott family arrived, the elder Mrs. Scott said they had come to get their cow. I told them they could have their cow, but they must keep her out of my corn, and then crossed on to the barnyard gate to turn out the cow.    The elder Mrs. Scott remarked that she did not think her cow had eaten any more of my corn this year than my mules had eaten of hers last year.    I then remarked that I did not want any foolishness; that they must keep their cow out of my corn. By this time I had taken hold of the barnyard gate latch.    The elder Mrs. Scott said she did not mean any foolishness, either; that she was in the road, and would say what she pleased.    At this time," the defendant continues, " John Scott was standing a short distance south of the barnyard gate, perhaps fifteen to twenty-five feet from where I stood, eyeing me with a very hostile look, with his right hand in his right pants pocket, and I heard something click in his pocket, which I believed to be

Rogers v. State.

the cocking of a pistol, and believing and fearing that he intended to shoot me, I turned around and walked across the road into my yard and into the house, and got a double-barreled shotgun, and walked back outside of my yard gate, and said to Scott: 'If you want to talk to me, take your hand out of your pocket.' He said nothing, but still kept his hand in his pocket. I repeated the request to him. He still said nothing, but stood, looking at me in the same manner. I repeated the request the third time, when the deceased hurriedly turned himself about half around and commenced drawing from his right hand pocket a pistol, and had gotten it partly out of his pocket, so that I could see that it was a pistol. I threw my gun up, and fired at him.''

It is perfectly obvious, upon the defendant's own statement, the theory of self-defense is out of the question. It is well settled that the real or apparent necessity to take life which is brought about by the design, fault, or contrivance of the defendant, is no excuse. Again, even if sufficient cause does exist for reasonable apprehension, but the killing is not done under the fear it is calculated to inspire, or the fear is simulated, this defense will not be available. If the defendant had been in any danger, real or apparent, during the colloquy that occurred when he first started to turn out the cow, he shows that he left the scene of the danger, and, going to a place of safety, armed himself with a double-barreled shotgun, and deliberately returned to the scene of

the difficulty.    With a loaded gun in his hand, in an angry and overbearing manner, he commanded the deceased to withdraw his hand from his pocket. Conceding the deceased did attempt at that moment to draw his pistol, as claimed by the defendant, the act of the defendant in killing him would not be justifiable homicide, but would constitute murder.

Again, the defendant was at fault in unnecessarily bringing about the hostile meeting by driving off his neighbor's cow, and confining it upon his own premises.    The proof also shows that he used the first offensive language towards the mother of the deceased, and, before any hostile demonstration had been made towards him, he returned to his house and armed himself with a shotgun.    His conduct in ordering the deceased to withdraw his hand from his pocket was wholly unjustifiable, and, in our opinion, he fired the fatal shot without sufficient or reasonable ground to apprehend danger to himself.

The verdict of the jury is well supported by the facts of the case.

Affirmed.