## JAMES D. HUGHES, Plaintiff in Error, v. STATE OF TENNESSEE, Defendant in Error.

### 465 S.W.2d 892.

Court of Criminal Appeals of Tennessee. June 22, 1970.

Certiorari Denied by Supreme Court Aug. 17, 1970.

R. Price Nimmo, Larry H. Spalding, Nashville, for plaintiff in error.

George F. McCanless, Atty. Gen., Thomas E. Fox, Deputy Atty. Gen., Ira E. Parker, III, and J. Randall Wyatt, Jr., Asst. Dist. Attys. Gen., Nashville, for defendant in error.

## OPINION

OLIVER, Judge.

James D. Hughes, the defendant below, was convicted of involuntary manslaughter in the Criminal Court of Davidson County and was sentenced to imprisonment in the State Penitentiary for not less than one nor more than five years. Failing in his motion for a new trial, he is now before this Court upon appeal in the nature of a writ of error duly perfected.

By one Assignment of Error the defendant advances the usual contention that the evidence preponderates against the verdict of the jury and in favor of his innocence; that the verdict is excessive; and that the trial court erred in failing to admit in evidence certain prison records showing mis-conduct on the part of the deceased. In considering the insistence with respect to the insufficiency of the evidence, we are bound by the rule, stated and restated over and over by our Supreme Court and this Court, that a jury's verdict of guilt, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in the evidence in favor of and establishes the State's theory of the case. Under such a verdict, the presumption of innocence, which the law accords an accused prior to conviction, disappears and is replaced by a presumption of guilt which puts upon him the burden of showing upon appeal that the evidence preponderates against the verdict and in favor of his innocence. We may review the evidence only to determine whether it preponderates against the verdict and, in doing so, we must take the verdict as having established the credibility of the State's witnesses. The

verdict will be disturbed on the facts only if the evidence clearly preponderates against it and in favor of the innocence of the accused. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Crim.App., 425 S.W.2d 799; Brown v. State, Tenn.Crim.App., 441 S.W. 2d 485.

The rule that the credibility of the witnesses and conflicts in the testimony are all settled by the verdict of the jury, "makes unnecessary and, indeed, inappropriate, a detailed discussion of that evidence, pro and con, * * * in stating what we conclude the material facts to be as established by that testimony." Hargrove v. State, 199 Tenn. 25, 28, 281 S.W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

■ We summarize the material evidence. This homicide occurred within the State Penitentiary at Nashville, where both the defendant and the deceased were inmates at the time. The defendant was indicted for first degree murder following the knife-slaying of one Carl A. Hamilton. A penitentiary guard, in charge of the commissary line and standing at the time some four or five feet from the corner of the commissary walk, who testified as the only prosecution witness of the incident, said that he saw the defendant chasing the deceased into a place formerly occupied by "* * * the old laundry * * *" and saw him cut the deceased with a knife; and that he surrendered the knife to the guard upon demand.

The defendant testified that about six weeks after he entered the penitentiary the deceased robbed him; that on the day preceding this final encounter the deceased

again robbed him at knife point, taking his wrist watch and several dollars in script, and told him he had better check into "A-Block" for his own protection. It appears from the record that a prisoner feeling himself in danger from another inmate could request removal to that area of the prison designated as "A Block" for protection. The defendant testified that the following evening while he was enroute to the prison school, carrying his books, the deceased approached from behind and knocked him down, then hit him three or four more times on the back of the head "* * * and put his arms around me and pulled me to him, and I would kind of pull away from him, and he ripped my shirt, pulled the buttons off of it. I had a knife, and I pulled the knife out and stabbed him, and we started fighting in a circle, and then the guard came out and said something, and I handed the guard the knife"; that the deceased was six or seven inches taller and much heavier and told him he was going to kill him, and that he feared for his life; that as they fought they moved in a semicircle and he did not chase the deceased or follow after him and was not behind him, and that they were more or less sideways to each other; that "We were moving back and forth all the time" and the deceased was hitting him in the face.

Another inmate testified as a defense witness that the defendant was on his way to school with his books under his arm, and that while they were stopped in brief conversation the deceased appeared and began yelling at the defendant and cursing him and said, "I told you to check in down at A block"; that the defendant turned and started toward the school across the street and the deceased struck him in the back or on his neck; that

"* * * they just kept scuffling, and all of a sudden Hambone (the deceased Hamilton) broke, you know, not to run, but just staggering more or less, toward the end of the commissary, and then Mr. Holloway (the guard), I think he was the officer there, walked up and said something and they carried Hambone to the hospital and James (the defendant) down to the new building, maximum security."

Another inmate said he was coming out of the commissary and saw the defendant coming up the sidewalk with his school books under his arm, and that the deceased ran out of the laundry building with something shiny in his hand and ran over and struck the defendant in the back of the head and knocked him down; and that he, not wanting to get involved, went on to his cell and saw nothing else.

Still another inmate testified as a defense witness that he saw the deceased come out of the laundry and charge the defendant and heard him curse the defendant and tell him that he should have "checked in," and then grabbed the defendant and struck him, and that they fought all the way up to the corner of the commissary and that neither was chasing the other.

Another inmate testified for the defense that he was in the commissary line at the time and the deceased came out of the laundry with a prison-fashioned knife in his hand and charged up behind the defendant, yelling obscenities at him and that "* * * I told you you'd better check in. I'll show you," and struck the defendant in the back of the head and knocked him down; that as they fought "* * * they backed off toward the wall of

the commissary and the laundry, and then they went back the other way, making an 'L' fashion, see, back toward the commissary door. This Sergeant Holloway (the guard), he came around from the door of the commissary and he hollered at them * * *"

Upon close analysis, there is nothing in this record to justify the guard's impression or to substantiate his testimony that the deceased was fleeing and that the defendant was pursuing him aggressively. Considering the uncontradicted testimony of the defendant and defense witnesses who saw the fight, that the deceased viciously attacked the defendant from the rear, knocking him down and reminding him of his previous warning to seek sanctuary in the protected area of the prison, and that in the ensuing fight these combatants moved progressively to the corner of the commissary building and into the guard's range of vision, there is no real or material conflict in the proof. The constant movement and the changing positions of these two men engaged in deadly combat could very well have given the impression that the defendant was pursuing the deceased at a particular moment or point in the course of the battle. Indeed, the uncontradicted defense evidence regarding the progress and course and movement of the fight to a position where the deceased and the defendant came within the view of the guard undoubtedly accounts for their relative positions and his impression at that moment. The defendant's testimony that when the deceased sat upon him he said that he was going to kill the defendant, and that the defendant acted in fear of his life, is uncontroverted in this record.

Obviously, by finding the defendant guilty only of in-

voluntary manslaughter, when he was indicted for first degree murder, the jury accepted the defendant's theory and proof regarding the inception and progress and incidents and culmination of this tragic event. The verdict cannot be explained in any other way.

Tennessee Code Annotated, § 39-2409 defines manslaughter as follows:

"Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act."

Involuntary manslaughter is a homicide committed under such circumstances that it plainly appears that neither death nor bodily harm was intended by the party doing the killing, and that death was accidentally caused by some unlawful act, or by some act not strictly unlawful in itself but done in an unlawful manner and without due caution, and that death was the natural or probable result of such act. Lee v. State, 41 Tenn. 62; Nelson v. State, 65 Tenn. 418; Manier v. State, 65 Tenn. 595; Copeland v. State, 154 Tenn. 7, 285 S.W. 565, 49 A.L.R. 605; Wade v. State, 174 Tenn. 248, 124 S.W.2d 710; Harper v. State, 206 Tenn. 509, 334 S.W.2d 933; Bartlett v. State, Tenn.Crim.App., 429 S.W.2d 131.

The defense in this case is self-defense. Under this record we are of opinion that this defense was properly raised and fully established. The proof leaves no doubt that the defendant acted in fear of his life and honestly believed, upon amply sufficient grounds, that the danger of death or great bodily harm to himself was imminent and certain. Nor is there any room for doubt, especially

in view of the deceased's previous threats and hostile actions toward the defendant and his announced purpose to kill him when he started this fight, that the defendant entertained such fear and that he acted under an honest and well-founded belief that it was absolutely necessary to kill the deceased to save himself from death or great bodily harm; nor is there anything in this record even suggesting that this danger ceased or diminished before the prison guard intervened and stopped the fight.

The law of self-defense is well-settled in this State. To excuse a homicide on the ground of self-defense, the danger to life, or of great bodily harm, must be either real, or honestly believed to be so, at the time of the killing, and such belief of danger must be founded on reasonable grounds. There must not only be sufficient cause to authorize the fear of death or great bodily harm, but such fear must be really entertained, and the killing done under an honest and well-founded belief that it is absolutely necessary in self-defense. Rippy v. State, 39 Tenn. 218; Williams v. State, 50 Tenn. 37; Hull v. State, 74 Tenn. 249, 257; Barnards v. State, 88 Tenn. 183, 12 S.W. 431; Allsup v. State, 73 Tenn. 361; Draper v. State, 63 Tenn. 246; Cathey v. State, 191 Tenn. 617, 235 S.W.2d 601; Frazier v. State, 117 Tenn. 430, 464, 100 S.W. 94. See also Arterburn v. State, 216 Tenn. 240, 391 S.W.2d 648, and Nance v. State, 210 Tenn. 328, 358 S.W.2d 327.

There is not the slightest intimation in this record that the defendant was in anywise at fault or provoked or brought about the difficulty by any design or contrivance on his part, so as to deprive him of the right to invoke the law of self-defense. Taylor v. State, 74 Tenn. 233;

Rogers v. State, 95 Tenn. 448, 33 S.W. 563; Floyd v. State, Tenn.Crim.App., 430 S.W.2d 888.

All the proof shows that the deceased was a much larger man than the defendant, several inches taller and much heavier. It is well settled that if great bodily violence is being inflicted or threatened on a person by one much stronger with such energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justified in killing his assailant. Bitner v. State, 130 Tenn. 144, 169 S.W. 565; Kress v. State, 176 Tenn. 478, 144 S.W.2d 735; Morrison v. State, 212 Tenn. 633, 371 S.W.2d 441.

In Bitner v. State, supra, the Court said:

"Where great bodily violence is being inflicted, or threatened, upon a person, by one much stronger and heavier, with such determined energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justifiable in using a deadly weapon upon his assailant. It makes no difference whether the bodily violence is being, or about to be, inflicted with a club, or a rock, or with the fists of an overpowering adversary of superior strength and size."

Of course, it is settled law in this State that the defense of self-defense presents a question for the determination of the jury. Arterburn v. State, supra; May v. State, 220 Tenn. 541, 420 S.W.2d 647. However, this rule itself presupposes record proof presenting a factual basis for consideration and determination by the jury. In the record before us there is no such basis for the jury's rejection of the defendant's defense of self-defense in killing the deceased. As stated, the verdict of involun-

tary manslaughter demonstrates conclusively that the jury believed and accepted the defendant's contention and theory and proof regarding the antecedents and the details of the fatal encounter from beginning to end. But, notwithstanding a correct and ample charge by the court, the jury very evidently failed to comprehend and grasp the cardinal principle that no legal culpability or liability attaches to a justifiable killing in self-defense.

From the foregoing summary of the evidence and review of the authorities, it is manifest that the defendant has carried his burden of demonstrating here that the evidence clearly preponderates against the verdict of the jury and in favor of his innocence.

■   We have carefully reviewed the other facets of the defendant's second Assignment of Error, as indicated at the outset, and find them without merit. Equally untenable is the first Assignment of Error, for the plain reason that the matters embraced therein were not included in the defendant's motion for a new trial. Assignments of Error which were not incorporated in the motion for a new trial will not be considered on appeal. In Wilkerson v. State, 208 Tenn. 666, 348 S.W.2d 314, the Court stated this rule as follows:

> "* * * We, of course, cannot consider these assignments which were not incorporated in the motion for a new trial or were not in any manner brought to the attention of the trial judge because under Rule 14, paragraph (5), as reported in 185 Tenn., and under the case of Hobbs v. State, 121 Tenn. 413, 118 S.W. 262, when the assignments are not included in the motion for a new trial we should not consider them."

Another statement of this rule is found in Kirby v. State, 214 Tenn. 296, 379 S.W.2d 780:

"Questions raised for the first time on appeal will not be considered, or stated in another way, the trial judge will not be put in error upon matters not brought to his attention for correction in the motion for a new trial. See Ex parte Calhoun, 187 Tenn. 372, 215 S.W.2d 789 (1948); Parker v. Reddick, 196 Tenn. 472, 268 S.W.2d 357, 45 A.L.R.2d 1086 [1096] (1954), and Rule 14(5), Rules of this Court, which provides in part:

'This is a court of appeals and errors, and its jurisdiction can only be exercised upon questions and issues tried and adjudged by inferior courts, the burden being upon the appellant, or plaintiff in error, to show the adjudication, and the error therein, of which he complains.' "

See also: Lawler v. McCanless, 220 Tenn. 342, 417 S.W.2d 548; Ezell v. State, 220 Tenn. 11, 413 S.W.2d 678; Rule 14(4) and (5), Rules of the Supreme Court of Tennessee.

The judgment of the trial court is reversed and the case is dismissed.

This case was heard and submitted to the Court prior to enactment of Chapter 330 of the Public Acts of 1969 increasing the membership of the Court.

GALBREATH, J., concurs.

WALKER, Presiding Judge (Dissenting).

I must dissent.

The State's proof shows that Hamilton, the deceased, was fleeing from the defendant; that the defendant, knife in hand, pursued him 24 or 25 feet and stabbed or cut him five times with a table knife filed to a point. One of these wounds was in the center of the back. The victim's only words were, "What in the world is wrong, boy?" The conduct of the parties when seen by the guard was not consistent with the defendant's claim that the deceased made such a sudden, fierce and deadly attack on him that he was forced to kill the deceased.

The defendant claimed that he was walking along with his school books in his hand; that the deceased suddenly hit him in the back of the head and knocked him to the ground; that Hamilton hit him again three or four times, ripped his shirt, threatened to kill him, and generally made a vicious and unprovoked assault on him. Through all of this vicious and deadly attack, the defendant says he did not drop his school books and was still carrying them under his arm. He does not claim that Hamilton had any weapon although some of his witnesses say they saw one. The guard saw none.

I think it was within the province of the jury to settle this issue. The jury was in a position to weigh all of the evidence and the credibility of the witnesses. The jury decided this issue in favor of the State's theory. I do not think this court should say that the evidence preponderates against that finding. Arterburn v. State, 216 Tenn. 240, 391 S.W.2d 648; May v. State, 220 Tenn. 541, 420 S.W.2d 647. It would have sustained a higher degree of homicide.

I would affirm the conviction.