**STATE of Tennessee, Appellee,**

v.

**Yyonna I. RICKER, Alias, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Nov. 21, 1980.

Permission to Appeal Denied by Supreme Court Feb. 2, 1981.

Roger D. Moore and Douglas A. Trant, Knoxville, for appellant.

William M. Leech, Jr., Atty. Gen., Robert L. Jolley, Jr., Senior Asst. Atty. Gen., Nashville, James R. Dedrick, Asst. Dist. Atty., Knoxville, for appellee.

## OPINION

TATUM, Judge.

The defendant, Yyonna I. Ricker, was indicted for second-degree murder and convicted of involuntary manslaughter. Her punishment was fixed at not less nor more than 2 years in the State penitentiary. On this appeal, she asserts that the evidence is insufficient to support a conviction for involuntary manslaughter and that the trial court erred in denying probation without granting her a hearing or a post-sentence investigation. We affirm the conviction but remand for a probation hearing.

This prosecution arose from a shooting that occurred in the early morning hours of May 27, 1979 that resulted in the death of Don Stafford. Between 2:00 and 2:30 A.M. on that date, Lieutenant Frank Shipley of the Knoxville Police Department went to a bus that had been converted by the victim into a residence. Before entering the bus, he observed the defendant sitting on an old single car seat and crying hysterically. She told him that she had done the shooting and that the weapon was in the bus. She also stated that the victim of the shooting was in the bus.

Upon entering the bus, Lieutenant Shipley observed the victim sitting in a chair, quivering, and holding a part of a sandwich in his hand. He had been shot in the chest, and blood was spurting from the wound. The officer also observed a .12-gauge shotgun without a stock lying on the floor about two feet from the chair, and he also noticed a machete on the floor of the bus. The victim expired shortly thereafter as a result of the gunshot wound.

Larry Berry testified that he knew both the defendant and the victim and that the victim had been the defendant's boyfriend up until about three weeks prior to the victim's death. Earlier on the night of the shooting, Berry and the victim went riding with a girl and stopped on the way back to the bus for sandwiches. Berry also bought milk to drink, and the deceased bought a Coca Cola.

Later, when Berry and the victim entered the bus, which had previously been locked, the defendant, who was standing inside the bus, held a shotgun on the victim. She said, "Don Stafford, I'm going to blow your damn brains out." She also threatened Berry if he did not tell her where they had been. She stated, "You don't believe it's loaded, do you?"; the deceased replied, "I know it's loaded. I keep it loaded." The defendant then picked up the machete and again threatened to shoot Stafford and cut Berry's head off, but she then threw the machete on the floor. As Berry's eyes were diverted from the defendant while he took a drink of milk, the shotgun was discharged at the defendant who was sitting in the chair eating a sandwich.

Continuing his testimony, Berry said that after the shooting, the defendant asserted that, "She didn't shoot him." However, Berry heard the victim say, "Larry, she shot me in the heart." The defendant telephoned an ambulance and stated, "I just shot a man, hurry." The defendant was about seven months pregnant at the time of the shooting.

The defendant was arrested at the scene by Detective Jonathan Lambert of the Knoxville Police Department. He testified that after advising the defendant of her *Miranda* rights and obtaining a waiver of those rights from her, she gave him the following statement:

"I called Don Stafford about 3 p. m. on 5–26–79, and he told me to call back because he was busy. I called him back about 6 p. m., 5–26–79. Said he would be down to my house in a few minutes. I waited until about 10 o'clock or 11 o'clock, and he never came to the house, so I went

up there. I was in the bus when he came in, sitting on the bed. Larry Berry was with him. I asked Don where he had been, and he said he went and got him something to eat. Larry Berry said, 'we ain't been with no girls.' And I said, 'I didn't say you had.' And Don started laughing and started walking back toward the bed and knocked the lamp over. I was getting ready to put the gun down, and the big knife hit it, and the gun went off hitting Don. Don said, 'Honey, you shot me,' and I didn't believe him. I saw that I had shot him, and I ran to the phone and called the police. I went outside and told Larry that I had shot Don. I then waited on the police to come."

There was considerable evidence given by the defendant and her witnesses that the deceased was a violent and turbulent person and had made numerous assaults upon the defendant and other persons previous to the shooting incident. We do not deem it necessary to describe these incidents in detail.

The defendant testified that she was living with her mother at the time of the shooting but had previously lived with the victim and that she was pregnant by him.

She further testified that at approximately 1:00 A.M. on May 27, the victim telephoned her and threatened to ram his van through her mother's house if she did not come to the bus. She left immediately and went to the bus but the victim was not there. Finding the door unlocked, she entered the bus and waited for him. When the victim entered the bus with Berry, she and the victim got into an argument. The victim grabbed the gun and said, "I'm going to kill you and that little bastard (i. e., her unborn child)." They scuffled over the gun, and the victim kicked the lamp plug, unplugging it. He bent over to replug the lamp and held the barrel of the gun while the defendant had the trigger end of it. Then, as he was replugging the lamp, he pulled forward on the gun; she pulled back; the gun went off; and the victim was shot.

Citing *Hughes v. State*, 3 Tenn.Cr.App. 602, 465 S.W.2d 892 (1970), the defendant reasons in her first assignment that since the jury did not convict her of second-degree murder, they must have accepted her theory of self-defense and should have acquitted her. In *Hughes v. State, supra,* this court reversed and dismissed a conviction of involuntary manslaughter when the uncontradicted evidence was that the killing was done by Hughes in self-defense. The *Hughes* case is distinguishable from the case at hand in that there is a sharp conflict in the evidence on the self-defense issue and the other facts. Berry testified that prior to the shooting, the victim did not threaten or physically abuse the defendant. As stated previously, he testified that the defendant was pointing the gun at the victim when he took his eyes off her momentarily while taking a drink of milk and that he then heard the gun discharge while in the defendant's hand. Further, there was credible evidence that the defendant admitted to the police after her arrest that the victim was laughing and walking toward the bed when he knocked a lamp over, that she was getting ready to put the gun down when it was hit by the knife and that the gun went off accidentally.

■ Involuntary manslaughter is a homicide committed under such circumstances that it plainly appears that neither death nor bodily harm was intended by the party doing the killing but that the death was accidentally caused by some unlawful act, or by some act not strictly unlawful in itself but done in an unlawful manner and without due caution, and that death was the natural or probable result of such act. T.C.A. § 39–2409; *Hemby v. State*, 589 S.W.2d 922, 927 (Tenn.Cr.App.1978); *Hughes v. State, supra.* There was abundant evidence that the defendant negligently and unlawfully pointed the loaded shotgun at the victim, that the shotgun was discharged accidentally, and that the death was the natural and probable result of the defendant's unlawful acts. This is not a case where the defendant was either guilty of murder or no offense at all. *See State v. Mellons*, 557 S.W.2d 497 (Tenn.1977). The trial judge properly instructed the jury on the lesser included offense of involuntary manslaughter. *See* T.C.A. § 40–2518.

■ We find evidence upon which a rational trier of fact could be convinced beyond a reasonable doubt of the defendant's guilt of involuntary manslaughter. Rule 13(e), Tennessee Rules of Appellate Procedure; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

In her second issue, the defendant insists that the trial court erred in denying probation as mandated by the Supreme Court in *Stiller v. State*, 516 S.W.2d 617 (Tenn.1974) and numerous other authorities. The defendant did not file a written application for a probated sentence. After the jury returned its verdict and the defendant was formally sentenced, the following colloquy took place:

"THE COURT: Mr. Trant, I assume you wish to file a motion for a new trial?

MR. TRANT: Yes, Your Honor. We would ask for the full thirty days in which to file a motion. I would also like to advise the Court at this time that we will be making an application for probation.

THE COURT: I'll set this for argument on the motion for a new trial. I'll set it for 9 a. m., February 22.

And on the application for probation, Mr. Trant, the Court has now heard the testimony in this case, and the Court has heard the social history of this young lady, and the Court has heard her conduct over a period of time in consorting with people of known criminal reputation. And the Court has heard her testimony on the witness stand, and the Court is of the opinion from what it already knows that it would be an exercise in futility and the spending of unnecessary funds to cause any further pre-sentence—that is, a post-sentence investigation in this case to be made. So, the Court considering the social history of this young lady as it knows it, as the Court has learned from this case, the Court taking particular note that while cohabiting with a man to whom she was not married, with whom she became pregnant and had a child, that that same man was known to have weapons—as counsel—Defense counsel

put it, illegal weapons, a sawed-off shotgun among other things, a large machete, a shotgun with the butt end of it off—the defendant keeping the company that she did with him, knowing of his dangerous qualities, and also knowing of the company that the deceased kept, all of this is a considerable insight to her social history. And the Court notes in this case that she still on the witness stand was denying that she shot the man that the jury found her to be guilty of killing. So, she is denied probation."

In *Maples v. State*, 565 S.W.2d 202, 206 (Tenn.1978), the Supreme Court, after affirming Maples' conviction for perjury, stated as follows:

"We have considered the other assignments of error filed by the petitioner and find them to be without merit, except an assignment dealing with the manner in which his petition for probation was disposed of in the trial court. It was apparently disposed of without a separate hearing, and even before a formal petition for probation had been filed. We find this to be irregular, and we remand the case to the trial court with directions that a proper hearing be held upon the petition for probation which has been filed, and any proper amendments thereto, and the entry of appropriate findings of fact and conclusions of law thereon. With this modification, the judgment of the Court of Criminal Appeals is affirmed at the cost of petitioner."

The State insists that, at the time of the *Maples* ruling, the burden of proof was not on the defendant and that the 1978 amendment to T.C.A. § 40–2904, which placed the burden of proof on the defendant to show entitlement to probation, changed the *Maples* result. The pertinent portion of the May 5, 1978 amendment to § 40–2904 states:

"The burden of proof shall be upon the defendant desiring probation to specifically show that he is entitled to a probated sentence. The trial judge shall consider whether the granting of probation will benefit the defendant and the public."

We do not agree that the above-quoted portion of the 1978 amendment changed existing law; this statutory language was merely declaratory of existing law. In *Frazier v. State*, 556 S.W.2d 239, 241 (Tenn.Cr. App.1977), this court said:

"Once a defendant has been convicted of a criminal offense, the burden of proof is upon him to show that he is entitled to the preferment, privilege and the grace of a probated sentence."

\* \* \* \* \* \*

"The vital considerations for the trial judge in considering the question of granting probation are whether the granting of parole will benefit the defendant and the public. . . ."

We think that the *Maples* decision is viable law, unaffected by any subsequent legislative enactment.

As inferred in the *Maples* case, we hold that the proper procedure is for a defendant seeking probation to file a written application, setting out facts which he intends to prove at the hearing. This procedure is necessary to enable the State to make appropriate preparation to refute or admit the facts alleged in the defendant's application or petition. Of course, in the case at hand, as in the *Maples* case, the trial judge denied probation before a written petition could be filed.

In her brief, the defendant asks that we direct the trial judge to recuse himself for the probation hearing. This we decline to do; T.C.A. § 40-2901, empowering trial courts to grant probation, provides in pertinent part:

"The powers here granted shall be exercised by the judge of the trial court presiding at the trial of original conviction, or by any successor judge holding court in that jurisdiction."

This provision renders it unnecessary for the State and the defendant to recall all of the witnesses introduced at the trial of original conviction; moreover, the judge may consider the evidence he heard at the original trial, along with the other evidence introduced at the probation hearing, in determining whether to grant probation.

While we concede that further hearing in this case may well be "an exercise in futility," we hold that existing law mandates consideration of any additional evidence that might be offered by the parties as a post-conviction hearing. The defendant is directed to file a written application setting out facts upon which she will rely at the hearing.

The judgment of conviction is affirmed. The case is remanded to the trial court for a hearing upon the petition for probation.

DWYER and CORNELIUS, JJ., concur.