Johnny HEMBY, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee, Jackson.

Nov. 9, 1978.

Certiorari Denied by Supreme Court July 9, 1979.

Robert C. Wilder, C. S. Carney, Ripley, for appellant.

William M. Leech, Jr., Atty. Gen., Richard S. Maxwell, Asst. Atty. Gen., Nashville, Michael W. Whitaker, Dist. Atty. Gen., Jon Kary Blackwood, Asst. Dist. Atty. Gen., Somerville, for appellee.

## OPINION

DUNCAN, Judge.

The defendant, Johnny Hemby, was convicted in the Lauderdale County Circuit

Court of involuntary manslaughter growing out of the death of his five week old son, John Rupert Hemby. He was also convicted of assault and battery upon his former wife, Mary Jane Hemby. The two cases were consolidated for trial, and the defendant received jail sentences of 11 months 29 days in each case, the sentences to be served consecutively.

In this appeal, the defendant contests the legal sufficiency of the convicting evidence, the denial of his motion for a severance, the refusal of the trial court to allow the defendant to testify regarding his recent religious experiences, the trial court's alleged comment on the evidence, and the trial court's refusal to run his sentences concurrently. We find no reversible error and affirm the judgments. However, for reasons expressed at the end of this opinion, the case must be remanded to the trial court for further proceedings.

The defendant does not challenge the sufficiency of the evidence regarding his assault and battery conviction, but in two assignments, he attacks the legal sufficiency of the evidence regarding his involuntary manslaughter conviction.

█ The evidence in this case showed that the defendant and Mary Jane Hemby were married in 1965 or 1966, divorced soon thereafter, but continued to live together. Three children were born of this union, the youngest being John Rupert Hemby, who was born in June 1977 and died on July 16, 1977. Apparently, the defendant and Mrs. Hemby remarried in the interval between the infant's death and the trial of this case.

On July 16, 1977, the Hembys were living with Mrs. Hemby's mother, Mrs. Mary Sue Cooper. Other family members were also living at that house, including Mrs. Hemby's sister, Lillian Sylvester, and the latter's husband, James Sylvester. The defendant had been drinking during the afternoon and evening of July 16, and near midnight on that date, while he and Mrs. Hemby were returning home from a pool hall, they had

an argument and the defendant slapped her. He then drove his truck into a corn field, and after they had got out of the truck, he hit Mrs. Hemby again. She sustained some rather serious injuries as a result of this beating. Thereafter, Mrs. Hemby got away from the defendant and hid in the corn field. The defendant drove the truck around and through the corn field doing considerable damage to the corn crop. Subsequently, the defendant returned home, arriving there around "12:00 or 1:00 a. m." Upon arriving there, the defendant awakened James and Lillian Sylvester, and told them that he and Mrs. Hemby had had a fight and asked them to go down to the corn field to look for her. The evidence is undisputed that at that time the defendant was highly intoxicated and "obviously drunk."

This defendant was charged with and convicted of involuntary manslaughter, it being the State's theory that while in a drunken stupor, he fell asleep on a bed in which his infant son was sleeping, apparently rolled over on the baby, with the weight of the defendant's body suffocating the sleeping infant.

Regarding the question of who had placed the baby in the bed, Mrs. Sylvester testified that she could not recall whether she or the defendant had carried the baby from its normal sleeping place to the bed. However, when she left to search for Mrs. Hemby, the baby was asleep in the bed, and the defendant was sitting on the side of the bed. The defendant told Mrs. Sylvester that the baby "would be alright in the bed."

The Sylvesters went to the corn field and called out for Mrs. Hemby, who did not answer for fear that the defendant was with them. The Sylvesters returned to the house, and at various points in her testimony, Mrs. Sylvester testified about the respective positions in the bed of the defendant and the baby as follows:

"A. Well, when we got back from the corn field, I went in there. I had to unlock the door and then I went in

and the baby was laying up under his side and I got my husband to go in there with me and I pulled the baby out from under him. Then when we got in the hall where the bathroom light was on, then I could see him in the light and could see he wasn't breathing and I give him to my husband and he tried to give him mouth-to-mouth."

.    .    .    .    .

"A. Well, Johnny was on the left-hand side of the bed. You know, he was laid out and the baby, with his face down, like that (indicating) was up under his side. You know, the side of his face was mashed down between the bed and his side and the rest of his body___ Not much of it was under there. Just from about right here to about there (indicating). His legs and all wasn't under his side.

Q. But his whole face was under his body?

A. Well, it was mashed between the bed and his side."

.    .    .    .    .

"Q. (By General Whitaker) The baby was last seen alive beside him; is that correct?

A. Yes, sir.

Q. And then was found underneath him when you returned?

A. Yes, sir.

Q. Did you wake Johnny up?

A. He didn't wake up. He was snoring loudly and all and I didn't know if he'd wake up is the reason I had my husband come in there with me and then when I pulled the baby out from the side, it didn't even phase him at all. He was just sleeping sound.

Q. You didn't arouse him at all by pulling the baby out from under him?

A. No, Sir."

.    .    .    .    .

(By Mr. Wilder—defense counsel)

"Q. Let me ask you about when you got back and went in to check on the baby. Let me ask you again to explain where the baby was found? Where did you see the baby when you walked in the room?

A. Up under Johnny's side.

Q. Specifically, describe to me, if you can again, where the baby was and where Johnny was in the bed?

A. Okay. Johnny was on the left side of the bed, laid out and all with his arms and all out.

Q. Was he parallel with the bed or was he cockeyed or how?

A. He was straight up and down.

Q. Okay. Go ahead.

A. And the baby was—his face was up under his side between, you know—turned sideways between him and the mattress.

Q. Johnny was on the left side of the bed and the baby was on his right side?

A. (Nodded affirmatively.)

Q. And then you got the baby out; is that correct?

A. (Nodded affirmatively.)"

.    .    .    .    .

(By Mr. Wilder:—defense counsel)

"Q. Mrs. Sylvester, I just need to ask you one or two quick questions. Would you again please testify as to when you entered the bedroom, upon coming back to the house that night, as to exactly the position of the defendant and of the baby?

A. Okay. Johnny was on the left side of the bed, laid out with his arms out and the baby was against his right side with his face down and with his face between his side and the mattress.

Q. Was the baby on his side?

A. You mean—what do you mean, on his side? He was up under it, sort of. His face was between his side and the mattress."

At another point, Mrs. Sylvester testified that the baby's right arm was underneath the defendant, "kind of wedged in, sort of." However, she later corrected herself and stated that she meant the baby's left arm.

James Sylvester, in describing what he observed in the room, testified:

"Well, my wife had went in there and she come back and wanted me to come in there and help her get it—she thought she might have to move Johnny's arm. So, when I went in there, the baby's head was turned to where it was between Johnny's side and the bed. So my wife went and grabbed the baby by its arm and leg and she didn't have to pull on it hard, but she, you know, pulled it out from beside him."

Dr. James Spencer Bell, Chief Deputy Medical Examiner for Shelby County, and Deputy Chief Medical Examiner for the State of Tennessee, as well as an associate professor of pathology at the University of Tennessee Medical School, testified that he had examined the infant's body and found it had "cyanosis" and a "small bruise on the right shoulder." Dr. Bell explained that "cyanosis" was "a bluish discoloration that you can see of the fingernail beds and, also, the lips when the individual doesn't have enough oxygen in the blood to make the fingernails and lips sort of look pinkish." Dr. Bell stated that he could not detect any traumatic injury in the child other than the small bruise of the right shoulder region, but did find that the infant's organs displayed changes characteristic of hypoxia, which is "not getting enough oxygen to the organs." Dr. Bell testified that these findings would be consistent with two major causes of death: (1) sudden infant death syndrome—or "crib death"—wherein a previously healthy baby, with perhaps at most a history of the sniffles, dies suddenly and

unexpectedly, and the autopsy reveals nothing more than hypoxia; (2) overlaying or smothering, which "would be in the case of when someone lays upon top of the child and prevents it being able to breathe."

Dr. Bell testified that when the symptoms suggest two possible causes of death—sudden infant death syndrome or smothering—then the case history and the circumstances surrounding the death is an important consideration. As he stated, "In a forensic pathologist's situation, which is what I am, you use not only the anatomical changes and the external body changes, but the historical phenomena, also." He further testified that without the benefit of the history, the cause of death could be either one, but that with the benefit of the case history in the present case, it was his expert opinion that "the child had been killed by overlaying or smothering."

Under cross-examination, Dr. Bell stated that based upon the case history of this death, ". . . I am willing to state that the cause of death in this instance is smothering by overlaying." Dr. Bell further stated that, "I think beyond a shadow of a doubt, that a child doesn't smother in covers, being tangled up in them. He doesn't smother by laying with his face down on the bed. If he's laid upon, he may smother." Dr. Bell also testified that an adult would normally be awakened upon rolling over on a child because there would be sufficient resistance to "disturb the adult enough that he should think about rolling off of it." He stated that a person under the influence of alcohol "could" or "could not" be so awakened by such resistance.

Dr. C. R. Webb testified in behalf of the defendant and explained the phenomenon known as sudden infant death syndrome as follows:

"It's one of the real enigmas that we have to contend with because it's a situation where the cause of the death is rarely ascertained. The thinking, I think, at the present time is that this is probably a rapid, overwhelming, viral infection. So,

frequently the history is that the child is put to bed by his parents on[e] night, apparently well, and then they awaken to find the child dead the next morning."

Dr. Webb agreed that an accurate case history would play an important part in determining whether a child's death resulted from sudden infant death syndrome or from smothering. He further agreed that in distinguishing between these two causes of death, one would have to look to the history and determine the physical facts surrounding the finding of the body. He also agreed that if a child's body was found under an adult, and that it was previously a healthy child, then the cause of death would possibly be more consistent with smothering by overlaying, rather than with sudden infant death syndrome. On re-direct, however, he admitted that under those same facts, it was possible for the cause of death to be sudden infant death syndrome.

The defendant, in his brief, cites the case of *Rucker v. State*, 174 Tenn. 569, 129 S.W.2d 208 (1939), for the proposition that where it is equally possible and probable that death resulted from one cause as from another cause, and the defendant is not responsible for one of the causes, then the evidence will not support a verdict of guilty. This is a correct statement of the law. However, in our opinion, it is not applicable to the present case.

From the medical testimony present in this case, it is apparent that when a pathologist is confronted with medical findings such as were found in the examination of this infant's body, then the case history is of vital importance in determining whether the death resulted from smothering or sudden infant death syndrome.

From the medical testimony present in this case, and from the obvious and reasonable inferences to be drawn from the proof, particularly from the testimony offered by the Sylvesters describing the position of the infant's body, and from all of the other facts and circumstances present in the case, we are of the opinion that the evidence clearly shows that this infant's death was caused by smothering brought about by the defendant overlaying its tiny body. This evidence does not show that it was equally possible that the infant's death was caused by sudden infant death syndrome. The jury has so found in this case, and its verdict cannot be overturned because the evidence does not preponderate against it.

We are of the opinion that the evidence in this case is sufficient to support the defendant's guilt of involuntary manslaughter, and we hold that the trial court acted properly in denying the defendant's motion for a directed verdict of not guilty as to this offense.

■ Involuntary manslaughter is a homicide committed under such circumstances that it plainly appears that neither death nor bodily harm was intended by the party doing the killing, but that death was accidentally caused by some unlawful act, or by some act not strictly unlawful in itself, but done in an unlawful manner and without due caution, and that death was the natural and probable result of such act. T.C.A. § 39–2409; *Harper v. State*, 206 Tenn. 509, 334 S.W.2d 933 (1960).

Applying the foregoing law to the defendant's actions in the present case, the evidence clearly is sufficient to support the jury's verdict finding the defendant guilty of involuntary manslaughter.

■ The State's theory of this case has been accredited by the verdict of the jury. *State v. Hatchett*, 560 S.W.2d 627 (Tenn. 1978). The jury was entitled to draw permissible inferences from the evidence. *Gossett v. State*, 224 Tenn. 374, 455 S.W.2d 585 (1970). The defendant has not carried his burden to show that the evidence preponderates against the verdict and in favor of his innocence. *State v. Townsend*, 525 S.W.2d 842 (Tenn.1975).

The assignments on the evidence are overruled.

■ Next, the defendant's complaint that the trial court should have granted a

severance of the two indictments for trial is without merit.

These two offenses are interrelated and arose out of connected acts. They occurred within a short time of each other. The evidence about the defendant's intoxicated condition and his mental state that existed at both incidents would have been competent evidence upon the trial of either offense. This evidence as well as other connected facts would have been provable by the same witnesses in both cases. When these things are present, it is not significant that other and additional evidence may have been proved regarding one or the other of the offenses.

Therefore it was within the discretion of the trial court to consolidate these two cases for trial. *State ex rel. Gann v. Henderson*, 221 Tenn. 209, 425 S.W.2d 616 (1968); *Epstein v. State*, 211 Tenn. 633, 366 S.W.2d 914 (1963); 23 C.J.S. *Criminal Law* § 931 (1961). With the reasonable sentences set for the defendant by the jury in these cases, we find that no prejudice has resulted to the defendant by reason of the trial judge's action in consolidating these cases for trial. We find no abuse of discretion.

Also, we find no error in the trial court refusing to allow the defendant to testify regarding religious experiences that he may have had in jail.

■ Evidence of a defendant's good character which existed prior to an alleged offense is relevant to strengthen his presumption of innocence. *Strader v. State*, 208 Tenn. 192, 344 S.W.2d 546 (1961). Also, a defendant's good character which existed up to the time he testified may be relevant to enhance his credibility as a witness. *Strader v. State, supra*.

■ Thus, any religious experiences which the defendant may have had after the occurrences of these offenses would not have been relevant to strengthen his presumption of innocence. While such evidence might ordinarily have been admissible to enhance his credibility as a witness, the fact is that his credibility was not in issue. It was the defendant's testimony that he could not remember any of the facts surrounding his commission of these offenses, and that he could not deny the testimony concerning his actions on that night. The defendant's conduct was undisputed. The only issues were the cause of the infant's death and whether the defendant's actions constituted criminal negligence with regard to the homicide case. In light of his testimony, his credibility could in no way affect the resolution of those issues.

■ Moreover, the jury had the benefit of the knowledge that the defendant had had some religious experience because his wife testified that she was no longer afraid of him "because Johnny has been saved and we've both been saved and it just practically killed him when we did lose the baby." Thus, if any error can be said to be present, it is harmless. T.C.A. §§ 27–116, –117.

In another assignment, the defendant says the trial court commented upon the weight of the evidence in his instructions to the jury.

Included in the court's charge was this statement:

> "An expert, Dr. Bell, has been allowed to testify in regard to the cause of death and did testify that in view of his examination and the history given him, that in his opinion, the cause of death was by overlay of the father, causing death by suffocation."

■ The defendant did not object to this statement by the trial judge and did not list this complaint in his motion for a new trial. In the absence of timely objection at trial, review of an alleged error by this Court is not in order. *Ezell v. State*, 220 Tenn. 11, 413 S.W.2d 678 (1967). Further, absent any patent invalidating error, the trial judge will not be put in error upon matters not brought to his attention for correction in the motion for a new trial.

*Pulley v. State,* 506 S.W.2d 164 (Tenn.Cr. App.1973).

■ Moreover, Article VI § 9 of the Constitution of Tennessee authorized the trial judge to state the testimony. From our review of Dr. Bell's testimony, we find that it is not inconsistent with the trial judge's statement. We hold that this statement was not a comment on the evidence. This assignment is overruled.

■ We find merit to the defendant's remaining assignment of error in which he complains about the consecutive sentences imposed in these cases. The trial judge did not indicate in the record his reasons for ordering the defendant's sentences to be served consecutively. Therefore, we remand this case for compliance with the requirement of *Gray v. State,* 538 S.W.2d 391 (Tenn.1976), that the trial judge indicate in the record the factors he considered in exercising his discretion. Upon compliance by the trial judge, the record will be returned to this Court for consideration of the trial judge's findings on the reasons for consecutive sentencing.

Affirmed and remanded.

DWYER and BYERS, JJ., concur.