JACK HARPER

*v.*

STATE OF TENNESSEE.

(*Nashville,* December Term, 1959.)

Opinion filed April 6, 1960.

Robert L. Richardson, Henderson & Henderson, Franklin, for plaintiff in error.

William D. Grugett, Assistant Attorney General, for the State.

512

M<small>R</small>. J<small>USTICE</small> T<small>OMLINSON</small> delivered the opinion of the Court.

Jack Harper's appeal is from a conviction of second-degree murder based on a first-degree murder indictment charging him with having so murdered Bill Simmons. A number of errors are assigned.

Mr. and Mrs. Simmons arrived at the home of defendant for a social visit in the afternoon of the Sunday that Mr. Simmons was shot in the home of Harper. In the forenoon of this Sunday Harper had consumed some whiskey and was asleep at the time the Simmons arrived. Some time after their arrival Simmons and Harper procured a pint of white whiskey. It was consumed in the course of time by Harper and, to some extent, by Simmons and Mrs. Harper, according to the testimony of Harper.

In the shank of the evening Harper caused Mrs. Harper, aided by Mrs. Simmons, to fry some ham which he had sliced and prepare other articles of food for a meal. But Harper declined to eat anything, though more than once urged to do so. He sat with his head face down on the dining room table. According to the testimony of Mrs. Simmons, but denied by Mr. and Mrs. Harper, three times during the course of the meal he arose, doubled his fist and threatened to strike Mrs. Harper. She urged him not to strike her, saying that she had done nothing to provoke him. Immediately after the third alleged men-

acing threat defendant went from the kitchen into an adjoining unfurnished room in front of the kitchen.

Then Mrs. Simmons suggested to her husband that it was time for them to go home. Mrs. Simmons, carrying their three year old daughter, started from the rear kitchen door to the car parked at the rear of, and close to, the kitchen, while Mr. Simmons started through the opposite door towards the front of the house for the purpose of getting their coats. As Mrs. Simmons was leaving the kitchen, or just after she emerged, she heard Harper in the room in front of the kitchen say "I've got it, I've got it, do you hear", and cursed. Mrs. Harper's testimony as to this is that she heard the defendant say something in the room into which he had gone, and Mr. Simmons replied "What you got?"

As Mrs. Simmons was getting in the car she says she heard a shot, and Mrs. Harper began to scream. Then Mr. Simmons came around the corner from the front of the house towards the car, and said "Oh my God, Jack shot me", meaning Harper. She, with Mrs. Harper accompanying, immediately undertook to hasten Simmons to a hospital. He died before they reached it from the effects of a bullet fired through his forearm practically straight into his stomach from a rifle belonging to defendant. It was fired in the room in which Harper and Simmons had entered from the kitchen a very brief interval before.

Up to this time there had been no unpleasantness of any character, with the exception of (1) the alleged menacing threats made by Harper upon his wife during the course of the aforesaid meal, and (2) the alleged curse

uttered by Harper in the room to which he had gone immediately after the alleged third threat.

The sheriff, the deputy and the coroner arrived at the Harper home within some forty-five minutes, perhaps, after the shooting. They found Harper asleep on the floor of the room into which he had entered. A rifle was about two feet from, and behind, him. When he was aroused he recognized each of these officers without any apparent difficulty. He first told them that there had been no trouble there. Then he admitted that he had shot a man by the name of Paul Cothran because Cothran's mother had told him, so he said, that Cothran was coming to his home "and whip me". He said he didn't know whether he had killed Cothran but "By God I meant to", because he didn't allow anybody to come to his house and whip him.

After the officers left Harper's home with Harper they learned that the person shot was Bill Simmons. When they so informed Harper, the latter replied that he "may have shot Bill"; that Bill was going to jump on him and whip him and he didn't allow anybody to come to his house and whip him.

■ The excellent brief submitted in behalf of Harper mildly suggests that the evidence is not sufficient to support a finding that Harper, rather than Simmons, was in possession of the riffe at the time it was fired. This suggestion is not tenable. After Harper reached the room in front of the kitchen he said, according to Mrs. Simmons, "I've got it, I've got it, do you hear". The only reasonable conclusion as to what he had "got" is that it was this rifle. Within a matter of seconds the rifle was heard to fire, and Mr. Simmons, bleeding profusely,

came from around the corner of the house to the car with the statement "Oh my God, Jack shot me". That remark was unquestionably a part of the res gestae. On his direct-examination Harper admits in effect that the rifle was in his possession at the time it was fired, but claims it was an accident. He denied on cross-examination remembering anything about the shooting because he was too drunk, he says. This record leaves no doubt but that Harper was in possession of the rifle when it was fired.

Malice is an essential ingredient of murder in the second degree. Harper's brief recognizes that every homicide is presumed to be malicious in the absence of circumstances rebutting this implied presumption. That brief insists that this presumption is completely rebutted here by the fact that from the time Mr. and Mrs. Simmons arrived at the Harpers until the firing of the shot which killed Simmons nothing unpleasant had occurred; hence, that the evidence supports only the conclusion that the homicide was a result of an accident.

Aside from the fact that the State is not required to supply a motive, the statement that all was continuously pleasant is not accurate. Three times, according to substantial evidence, during the course of the meal which immediately preceded the shooting, Harper, for no apparent reason, made menacing threats of violence to Mrs. Harper. The third threat was immediately followed by his departure into the room in which the rifle was. His statement almost immediately thereafter that "I've got it, I've got it * * *", followed by what happened, requires the conclusion that he was looking for that rifle for some purpose. His action almost immediately thereafter in

firing the rifle after uttering a curse is substantial evidence that his drunkenness that day had progressed to such an extent that he was nourishing a malice at the time he fired the rifle, or was in a frame of mind generally bent on mischief.

When the officers arrived less than an hour thereafter he had sufficient mental faculties to recognize them. He remembered the details of the meal immediately preceding the shooting. He told the officers that he had shot a man named Cothran and that "By God I meant to". Here is further evidence of a malignity of heart at the time of the tragic event, notwithstanding the fact that his drunkenness had progressed to such an extent that he thought, if his statement is to be accepted, that the man to whom that malignity was entertained was Cothran. That is mentioned here because it is evidence that Harper fired the shot maliciously with deadly intent.

And in the same conversation Harper said it may have been Simmons whom he intended to shoot, because Simmons was going to jump on him and whip him, and he didn't allow anybody to come to his house and whip him. There is no evidence or intimation in the evidence that Simmons had ever made any threat or attempt to whip Harper at Harper's home or anywhere else. The fact is inescapable that Harper was quite drunk when he fired the shot. The evidence also justifies a finding that the shot was fired with malicious intent at the man he was facing—Simmons.

But "the only consideration given to the fact of drunkenness or intoxication at the time of the commission of the crime of murder is to enable the court and jury to determine whether the prisoner may not be

guilty of murder in the second degree, rather than of murder in the first degree." *Atkins v. State,* 119 Tenn. 458, 480, 105 S.W. 353, 358, 13 L.R.A.,N.S., 1031.

It is emphasized in the Atkins case, supra, that no degree of drunkenness will excuse murder in the second degree when that drunkenness was voluntarily incurred, as here it was, unless continuous drunkenness over a long period of time had caused a habitual and fixed madness. There is no such claim here. To the contrary, it seems to be conceded, as it should be, that his mental condition was temporary, and caused by the whiskey he had consumed that day.

The thought of Harper that Simmons had threatened to whip, or was attempting to whip, him was solely a creature of Harper's imagination produced by drunkenness. It, therefore, follows that it must be concluded that Harper shot Simmons without the slightest provocation, since drunkenness is not to be considered in determining whether Harper is guilty of murder in the second degree.

If it be assumed that Harper spoke the truth in thinking, while in a highly intoxicated condition, that it was Paul Cothran at whom he was shooting the result is the same. Cothran was admittedly not in Harper's home that day. Harper's act, therefore, had it been Cothran, would likewise have been without provocation since drunkenness is no excuse when the homicide is otherwise second-degree murder. So his guilt is identically the same as if he had known that it was Simmons at whom he was shooting.

The law is that if an unlawful act directed at a particular person for the purpose of taking his life

accidentally brings about the death of a third person against whom no injury was intended the party inflicting the act is guilty to the same extent as if he had a specific intention to take the life of the person who was killed. *Bratton v. State*, 29 Tenn. 103; *Gray v. State*, 203 Tenn. 332, 313 S.W.2d 246.

In this connection, it is insisted that there is no evidence that Harper maliciously killed Simmons, other than the confession as to which the officers testified on direct-examination. This follows the insistence that the implied presumption of malice has been conclusively rebutted by the circumstances under which it occurred—an insistence heretofore overruled.

■ The Court has hereinbefore mentioned circumstances, aside from the confession, which the jury might well regard as affirmative evidence of a malicious intent. It is said, however, that notwithstanding such other evidence the Court committed reversible error in admitting over the objection of the defendant this confession made to the officers at the home of Harper. This objection was grounded on the proposition that Harper was drunk at the time he made the confession. The fact that Harper was drunk at this time only goes to the credibility of his confession rather than to its admissibility.

■ The Court doubts that counsel would have assigned the error just stated except for the fact that counsel was under the erroneous impression that he had objected to the introduction of this confession. The fact is that these officers on direct-examination, and after they had testified to the drunken condition of Harper, related the confession without any objection, in so far as this Court can find in the record. In Michie's Digest, Volume

1, under "Appeal and Error", page 669, Section 312, is a statement that "it has been repeatedly held that the admission of illegal evidence, without objection, cannot be assigned as error". A number of cases are cited. Among these is *Stacker v. Louisville & N. Railroad,* 106 Tenn. 450, 452, 61 S.W. 766, 767. There the Court, after noting the absence of exception, said that "for these reasons the assignment is not well made".

On the same principle the Court must overrule the assignment of error based on alleged objectionable and improper argument of the Attorney General. No objection to the argument was made at the time. "It is thoroughly settled, under our practice, that objectionable argument or improper remarks of counsel afford no ground for a new trial, where no objection is made or exception taken at the time of the argument". *Turner v. State,* 188 Tenn. 312, 324, 219 S.W.2d 188, 193.

Between two and three hours after the homicide, and while the defendant was in the automobile of the sheriff in front of the home to which Mrs. Simmons had gone, it was testified by Mrs. Simmons over the objection of defendant that she said to him that he had killed a good man without cause and had subjected her and their "little girl" "to the mercy of the world", and that Harper replied "you'll get by all right—give me a cigarette".

The probability is that the Trial Court overruled the objection of the defendant to the question and answer because (1) he considered the question and the answer it produced so connected with the homicide by reason of its spontaneity and logical connection with the homicide as to be a part of the res gestae, and (2) because the

ground stated for the objection was that Harper's reply was incompetent because he was drunk.

Regardless of whether the question and answer was a part of the res gestae, a proposition which it is not necessary to decide, it seems reasonably clear that the objection was on an erroneous basis. The question of his intoxicated condition only affected the credibility, but not the admissibility, of Harper's reply. The colloquy was likewise admissible because the answer of Harper further reflected his lack of regret—hence malice—for the homicide which he had committed.

█ It is assigned as reversible error that a Mrs. Judkins was allowed to testify that Mrs. Harper, on the day after the homicide, said that she would like to go back to her home for some purpose before Mr. Harper got back there, because she was scared of him and "there is no telling what he will do to me".

The objection of defendant was to Mrs. Harper's alleged statement that she "was scared of" her husband. The ground stated in behalf of Harper for the objection was that it was "entirely immaterial". The Court thinks that this objection was well made on the ground stated, to-wit, that it was "entirely immaterial" to the question at issue. Nor does it appear to have affected the results. Therefore, it was harmless error.

█ When the State called Sheriff Huff back in rebuttal to testify for the purpose of contradicting Mr. and Mrs. Harper, and in response to a question stated that two weeks before this homicide when he arrested Harper he noticed blood on the back of his shirt; that Harper told him that "he and his wife had had some trouble and she had stabbed him with a butcher knife"; and that for

some reason other than this on that occasion the sheriff "booked him down there at the county jail". This testimony was objected to on the ground of immateriality. It is insisted that the overruling of this objection was prejudicial error.

Mrs. Simmons on direct examination testified that while she and her husband were at the defendant's home on the day of the homicide the defendant told them, while his wife was out of the room, that his wife had stabbed him with a butcher knife to the extent that "it took both hands to pull it out". But that he said he didn't go to a doctor because "he was 'hot' with the law, they had raided him and he didn't want to get mixed up". No objection in behalf of Harper was made to this testimony. Therefore, whether the Court erred in permitting Huff to testify in rebuttal to this alleged incident is immaterial and was harmless. It had previously been permitted to go to the jury without objection.

After the motion for a new trial had been overruled, there was filed an amendment to the motion seeking a new trial on the ground of evidence newly discovered after the motion for a new trial had been overruled. The new evidence alleged was that after the motion for a new trial had been overruled Mrs. Simmons filed her suit for damages against Harper, and her declaration that her husband's death was "the result of a negligent and careless act of defendant" and that for some time after her husband's death, and because thereof, she had suffered a nervous breakdown. It is said that this discloses that Mrs. Simmons had a financial interest in securing Harper's conviction and that contrary to her trial testimony, her declaration in the civil suit "did not claim that

the death of her husband was caused by the intentional act of the defendant".

It is fairly clear that the newly discovered evidence alleged is to impeach or discredit the testimony of Mrs. Simmons. It could serve no other, if any, purpose. The law is that "in a criminal prosecution, an application for a new trial will be denied where it appears that the only tendency of the newly discovered evidence is to impeach or discredit the prosecuting witness or other witness for the state, * * *." *Gantry v. State,* 184 Tenn. 299, 311, 198 S.W.2d 643, 649.

█ At the close of the Court's charge defendant requested that the jury be given the following instruction:

"I charge you that if the defendant accidentally killed the deceased, and was not engaged in the commission of an unlawful act which caused the accidental killing he would not be guilty of any offense, notwithstanding the fact that he may have been intoxicated at the time. In such case your verdict should be not guilty."

The refusal of the Court to give this instruction is assigned as a material error.

█ This special request is not strictly accurate in that the accurate definition is:

"Involuntary manslaughter is where it plainly appears that neither death nor bodily harm was intended by the party killing, and that death was accidentally caused by some unlawful act, or by some act not strictly unlawful in itself, but done in a reckless and unlawful manner and without due caution, and that death was the natural or probable result of such act."

The requested instruction omitted the statement:

> "or by some act not strictly unlawful in itself, but done in a reckless and unlawful manner and without due caution, and that death was the natural or probable result of such act."

The settled law is that "a reversal will not be made for the refusal of trial judge to give an instruction, unless it was strictly accurate." *Willcox v. Hines*, 100 Tenn. 524, 536, 45 S.W. 781, 784, and see *Lewis v. State*, 202 Tenn. 328, 304 S.W.2d 322, the case relied upon by the Trial Judge in refusing to give the instruction requested.

It is also well settled that when the Trial Court refused to give in charge to the jury a special request presented by a defendant a reversal will not be had on that account when "it does not affirmatively appear that the refusal of these requests affected the result of the trial, as required by Section 27-117 Tenn.Code Ann." *Tenn. Farmers Mutual Insurance Company v. Hammond*, 43 Tenn.App. 62, 306 S.W.2d 13, 16. That rule is applicable here.

When the Court correctly charged the jury that an accidental death had to be "caused by some unlawful act", the jurors could not avoid understanding that if the accidental death was not caused by an unlawful act or lawful act done in a reckless and unlawful manner, etc., that then the accidental killing was not sufficient to constitute involuntary manslaughter.

Further, it must be presumed that the jurors knew that which was general knowledge, and were men of ordinary intelligence. It is general knowledge among

people of ordinary intelligence that an accidental homicide which did not result from an unlawful act or an act done in an unlawful manner, etc., is not an unlawful homicide.

So, viewing the question under either of the aspects mentioned it is, very reasonable to conclude that the failure to give the instruction requested did not affect the results of the trial.

The Court finds that the evidence does not preponderate against the verdict and that no material errors were committed during the course of the trial. Hence, the judgment of the Circuit Court will be affirmed.