IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
ASSIGNED ON BRIEFS JULY 18, 2000

## STATE OF TENNESSEE v. REGINALD TYRONE DONNELL

**Direct Appeal from the Criminal Court for Wilson County
Nos. 97-1308, 97-1309     J.O. Bond, Judge**

---

**No. M1999-02184-CCA-R3-CD - Filed November 30, 2000**

---

Defendant, Reginald Tyrone Donnell, was indicted on two counts of first degree murder. A Wilson County jury found him guilty of two counts of second degree murder. Following a sentencing hearing, the trial court sentenced the Defendant to twenty-five (25) years in the Department of Correction for each count, with the sentences to run consecutively. The Defendant now appeals contending: 1) the evidence was insufficient to support convictions of second degree murder, 2) the trial court failed to exclude autopsy photographs of the victims, 3) the sentences imposed by the trial court were excessive, and 4) the trial court erred in ordering consecutive sentences. After review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Steve McEwen, Mountain City, Tennessee; Comer Donnell, District Public Defender, for the appellant, Reginald T. Donnell.

Paul G. Summers, Attorney General and Reporter; Clinton J. Morgan, Assistant Attorney General, Robert Hibbett, Assistant District Attorney; David Durham, Assistant District Attorney, for the appellee, State of Tennessee.

### OPINION

### FACTS

On the evening of July 9, 1997, the Defendant fired shots on Lake Street in the Upton Heights housing projects in Lebanon, Tennessee. After Defendant stopped shooting, witnesses found the wounded bodies of Brenda Corder and Deon Starks lying at two different points and on opposite sides of the street. The victims were still alive, when initially noticed by the witnesses.

Lakisha Weir testified that on July 9, 1997, Shagina Clark, Lula Wade, Wade's granddaughter and herself, drove to the Upton Heights projects looking for Derrick Neal. Weir testified that as they drove down the street, they saw Derrick Neal standing at an area called "the rails." ("The rails" is an area where guard rails cross over a creek bed.) Weir further claimed that when they stopped at "the rails", she told Darrell Muncie that he should pay her back the money he owed her, and Muncie said he would pay her. Then, Weir explained that she said "f__ you" to the Defendant and he said "f__ you" in return. Weir stated that she and the Defendant were just playing, as they always did. Weir testified that as she and her friends drove off, she heard shooting and saw that it was the Defendant shooting. She claimed that the Defendant was the only person she saw shooting that night.

On cross examination, Weir admitted that she and the Defendant were best friends. She stated that she and the Defendant were not mad at each other and that she did not believe he was trying to shoot and kill her. She testified that as they were driving down the street, a young woman ran out in front of the car and stopped them. Weir explained that this young woman told them that Deon Starks had been shot. Weir said that she pulled the car over and went to where Deon Starks was lying. Weir said she was with Starks until the ambulance arrived.

Lula Wade testified that she and her granddaughter, along with Lakisha Weir and Shagina Clark, went to the Upton Heights housing projects on July 9, 1997, to look for one of Shagina Clark's friends. When they approached "the rails", she saw the Defendant standing there with other people. Wade was sitting in the back seat of the car, when she heard the Defendant tell Shagina Clark to go back to the west side before he started shooting. She stated that everyone was laughing and playing as they were talking. As the women were leaving, but before they could do more than (5) miles per hour, the Defendant began shooting. Wade testified that, at this point, a woman came by and told her to get her granddaughter down. She took her granddaughter out of the car seat, laid her on the floor of the car and then she lay on top of her. She recalled hearing approximately three shots fired. Shortly after that, she stated she heard two more shots. She further claimed that she was afraid.

At this point, Cretia Logue ran out, stopped their car and told them that Deon had been shot. Wade, Weir and Clark got out of the car and went to Deon. Upon seeing Deon, Wade called Deon's grandmother's house and told Deon's brother that Deon had been shot. Lula Wade noticed that Deon was shot in his lower back. While Wade was with Deon she heard people saying that another person had been shot. Wade stayed with Deon until the ambulance arrived.

Shagina Clark testified that she was riding around with Lacretia Weir, Lula Wade and Wade's granddaughter on the night of July 9, 1997. The women had gone to Murfreesboro and were returning to Lebanon. They were almost out of gas and needed money for more gas. Clark suggested that they ride through Upton Heights to look for one of her friends, and ask him for some money. As they were driving through the housing projects, Clark noticed her friend, Derrick Neal and others standing near "the rails". She asked Neal for $3, which he stated he did not have. While Clark was talking with Derrick Neal, Lakeisha Weir and the Defendant were talking. As Clark and Weir began to leave, Clark testified that she heard Weir say "f__ you Tyrone" and the Defendant

responded "F__ you, bitch. Go back to the east side." Clark stated that as they pulled away from "the rails", she heard between five (5) and seven (7) shots fired from behind them. She claimed that she tried to get down because she did not want to get shot.

Clark testified that as they were driving away, they saw people ducking under trees and they began to laugh. At that point, Cretia Whitney stopped the women and told them that Deon Starks had been shot. They pulled over to the side of the street and went to check on Deon. Clark stated that she told Lula Wade to call Deon's grandmother's house to let them know Deon was shot.

Shawrekia Logue testified that, on the night of July 9, 1997, she was standing at "the rails" talking with her boyfriend when the car carrying Weir, Wade and Clark stopped at "the rails". She saw the women talking with the Defendant and others standing at "the rails", but she did not hear their conversation. As the women in the car were driving away, Logue saw the Defendant pull out a gun and start shooting. Logue claimed that she told the Defendant to stop shooting, because her mother and daughter were across the street. Logue stated that she heard more than one shot fired, but she did not know the exact number of shots fired. Logue testified that her mother called her across the street to help cover Brenda Corder, who had been shot. Afterwards, the Defendant walked over to where Brenda Corder's body was and she heard him say that "if he would've shot her, he wouldn't be standing there." Then, Logue testified that after she heard that Deon had also been shot, she went to where he was lying. Logue said that she did not see anyone else shooting that night. Logue admitted that the Defendant and Brenda Corder were her relatives.

Roy Nunley, Brenda Corder's brother, testified that while he and the Defendant were in the Wilson County jail, he asked the Defendant if he killed Brenda Corder. Defendant responded that he did not know if he killed Corder and that if he (Defendant) did kill her, he did not mean to. Nunley testified that he thought the Defendant was telling him the truth.

Bonessa Hastings testified that she saw her best friend and the Defendant in some bushes near 305 Sycamore Street in Wilson County, Tennessee on the night of July 9, 1997. Hastings stated that Defendant asked her to go to his grandmother's house and get a gun from the backyard and destroy it. Hastings explained that she told the Defendant that she knew the two people who had died in the projects that night. Hastings stated the Defendant told her that the shooting was an accident and that he was shooting up in the air. Hastings further testified that the Defendant told her that the shots were meant for a black car containing Horace Nunley, Timmy Cason, Tony Logue and Derrick Logue. She said Defendant told her that he and the people in the black car were shooting at each other.

On cross examination, Hastings admitted that at the time all these events took place she was on crack cocaine. She also explained that since then she had been through a rehabilitation program.

Darrell Muncie testified that he and the Defendant were at "the rails" on the night of July 9, 1997. Muncie asserted he saw the Defendant with a handgun and he heard the Defendant talk about having a .380 caliber gun. Muncie stated that before the shooting, he and the Defendant were talking and joking with LaKeisha Weir and Shagina Clark. The Defendant told Weir and Clark to get out

of there before he started shooting. Immediately after the women began driving away, the Defendant started shooting and they all ran. Muncie said he did not see the Defendant shoot anyone, but he saw the Defendant shooting in the air.

Jerrod Hurd testified that, on the night of July 9, 1997, he was standing outside in the Upton Heights housing projects with his sister, when he saw Deon Starks walking toward his home. Hurd explained that on the same night, he saw the Defendant and approximately fourteen (14 ) other people standing about fifteen or twenty yards away at "the rails". Hurd stated that, at some point, he heard three gun shots fired. He testified that he did not see who shot the first two shots, but that he witnessed the Defendant firing the third shot into the air. The Defendant was not shooting at anyone else. Hurd explained that, on the night in question, he did not see anyone else shooting or carrying a weapon.

Officer Tommy Maggart testified that, at approximately 9:32 p.m. on July 9, 1997, he was on his way to work when he received a call over the radio about a possible shooting in the Upton Heights housing projects. When he arrived at Upton Heights, he found the body of Deon Starks lying in the front yard at number 9. At some point, he went down the street to 181 Upton Heights where he found a large crowd surrounding the body of Brenda Corder, lying face down. The upper half of her body was in the street and the lower half on the sidewalk. Officer Maggart further explained that the upper half of Brenda Corder's body was under a tractor-trailer truck, parked in front of number 181. The driver of the truck had covered Corder's body with a blue blanket. Maggart stated that Brenda Corder had what appeared to be a bullet wound in her back, but she was alive. Maggart stayed with Corder until the ambulance arrived. Maggart also claimed that when he arrived in Upton Heights, more than two hundred people were on Lake Street.

Officer Bob Harrison testified that, on July 9, 1997, he responded to a radio call about a possible shooting in Upton Heights. Officer Harrison testified that when he arrived at Upton Heights, he observed the body of Deon Starks face down between number 8 and number 9, being attended by some citizens and police officers. When the ambulance arrived, they turned over the care of Starks to the paramedics. Officer Harrison stated that, at this point, Starks was still alive. Harrison further explained that both Corder and Harrison were alive when the EMT's took them to University Medical Center. However, both died within a matter of hours and the EMTs transported their bodies to Dr. Charles Harlan's office in Nashville for autopsies.

Harrison testified that after his captain appointed him lead investigator in this case, he returned to Upton Heights to take some measurements. Officer Harrison stated that his measurement from a dirt strip in front of "the rails" to the approximate location of Corder's body was two hundred thirty-seven feet. The distance to Starks' body was seven hundred thirty-nine feet.

Officer Harrison also testified that he went to the office of Dr. Harlan, the forensic pathologist, to receive a projectile. He stated that he placed the projectile in an envelope, which he sealed and signed with his initials. Officer Harrison stated that he took the projectile to the State Crime Lab in Donelson.

4

Officer Harrison further testified that he received shell casings from Detective Steve Nokes, which he sealed in an envelope and signed his initials. Officer Harrison explained that he placed the envelope with the casings, in the police vault. The following day, Officer Harrison took the casings to the State Crime Lab for examination. Officer Harrison identified these various exhibits at the trial.

Harrison also identified a photograph of the crime scene taken during daylight hours. Harrison used the photograph to show the location of "the rails" and to show approximately where the victims' bodies were found. Harrison further stated that trees cover the length of Lake Street and hang over the sidewalk. Officer Harrison further stated that based upon his measurements, the approximate angle between the two victims and the person standing at "the rails" was seven (7) degrees.

Detective Stephen Nokes, a narcotics investigator for the Lebanon Police Department, testified that on the night of July 9, 1997 he found three spent .380 semi-automatic casings at the creek near "the rails." Nokes tagged and photographed the spent casings and gave them to Officer Harrison to take into evidence.

Dr. Charles Harlan testified that he performed the autopsies on the bodies of Brenda Corder and Deon Starks on July 10, 1997. ( The trial court permitted Dr. Harlan to use twenty-two (22) autopsy photographs during his testimony.) Dr. Harlan explained that twenty-five (25) year old Deon Starks died of a gunshot wound to the abdomen with projectile entry at the right buttock. Dr. Harlan concluded that the bullet that went through and produced a fifty (50) percent tear in the right external iliac artery caused Deon Starks' death. Dr. Harlan recovered the projectile from Starks' body.

Dr. Harlan further testified that forty-one (41) year old Brenda Corder died of a gunshot wound to the chest. Harlan stated that Corder had a second gunshot wound, where a bullet grazed her left hand. Harlan stated that the bullet entered Corder's back and exited through her chest; and this exit wound in Corder's chest prevented the recovery of a projectile from her body. On cross examination, Dr. Harlan testified that he did not know if the bullet, which went through Corder's chest was the same bullet that grazed her hand. He also stated that he did not know if the bullet(s) came from the same direction.

Special Agent Steve Scott, a forensic scientist for the Tennessee Bureau of Investigation, testified that he did an examination of the bullet found in Deon Starks' body. Scott identified it as a .380 caliber bullet, fired from a .380 semi-automatic pistol. Agent Scott also testified that the three spent casings recovered at the scene came from the same gun.

On cross examination, Agent Scott explained that he did not match the bullet found in Deon Starks to either of the three casings given to him for examination. Agent Scott further testified that he did a firing test with a .380 semi-automatic on a sunny day, with no obstacles in the firing path and with a stationary target. Scott concluded that the gun used during the firing test was probably identical to the one used to kill Corder and Starks. Further, Scott testified that he had difficulty

hitting his target from seventy-five (75) feet away, which would make it more difficult to hit a target at 200 and 700 feet away. Scott explained that when a bullet leaves the barrel of the gun, it will travel in a straight line until the pull of gravity causes it to fall or until it strikes an object that causes it to deflect or to stop.

The Defendant presented no proof on his behalf. Based on this evidence, the jury found the Defendant guilty of two counts of second degree murder.

## I. Sufficiency of the Evidence

When a Defendant challenges the sufficiency of the convicting evidence on appeal, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Neither does this Court substitute its inferences for those drawn by the trier of fact from the circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305 286 S.W.2d 856, 859 (1956). The law compels this Court to grant the State the strongest legitimate view of the evidence contained in the record plus all reasonable and legitimate inferences that may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

It is upon the jury to resolve questions concerning the credibility and weight of the witnesses' testimony, not this court. State v. Darnell, 905 S.W.2d 953 (Tenn. Crim. App. 1995). A finding of guilt "shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). However, a jury conviction removes the presumption of innocence from the defendant and replaces it with one of guilt. Thus, on appeal, a convicted defendant has the burden of establishing the insufficiency of the evidence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

These standards apply to jury convictions based upon direct evidence, circumstantial evidence, or a combination of both. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). However, convictions based solely on circumstantial evidence, require facts and circumstances that are so overwhelming as to exclude any other explanation except the defendant's guilt. State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987).

In support of this issue, Defendant contends that the trial court violated his Fifth Amendment right to due process by instructing the jury on the doctrine of transferred intent. In Millen v. State, the most recent opinion from our supreme court regarding transferred intent, the Court upheld the application of the doctrine in first degree murder cases but noted that "unintended victim" cases are most appropriately prosecuted as felony murder. Millen v. State, 988 S.W.2d 164, 167-68 (Tenn. 1999). The Court concluded that the mens rea of "intentionally," as defined by Tennessee Code Annotated section 39-11-302 (1997), is result oriented focusing on whether the defendant intended "to engage in the conduct or cause the result." Id. at 168. Similarly, the mens rea of "knowingly" required for second degree murder can also focus on the result. Tenn. Code Ann. § 39-11-302(b) (1997) specifically states that a person acts "knowingly" when he is aware that his conduct is reasonably certain to cause the result. To this end, the Millen Court also noted that previous cases

have upheld the doctrine's application in second degree murder cases. Id. at 166; see State v. Harper, 206 Tenn. 509, 334 S.W.2d 933 (1960); State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). Thus, we find no error in the trial court's instruction on transferred intent.

We find that the Defendant has failed to show that a rational trier of fact could not have found him guilty beyond a reasonable doubt of second degree murder. The law presumes a homicide to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). This presumption places upon the State the burden of establishing the premeditation necessary to elevate the crime to first degree murder. Brown, 836 S.W.2d at 543. Tennessee Code Annotated section 39-13-210 (1997) defines second degree murder as a "knowing killing of another."

As noted above, the "knowing" requirement of second degree murder

. . . refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b) (1997) (emphasis added). Moreover, "a defendant acts knowingly . . . when he or she is aware of the conduct or is practically certain the conduct will cause the result, irrespective of his or her desire that the conduct or result will occur." Id. (Sentencing Commission Comments); State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App 1993).

The Defendant argues that the evidence preponderates against and is inconsistent with a conviction for second degree murder. Circumstantial evidence can establish the crime of second degree murder. State v. Collins, 986 S.W.2d 13, 18 (Tenn. Crim. App. 1998). The evidence here, when viewed in the light most favorable to the State, shows the following: 1) Defendant had warned Weir and Clark that he would start shooting if they did not leave, 2) as Weir and Clark were driving away, Defendant began shooting a handgun, 3) Weir, Clark, Wade, Muncie, Logue and Hurd testified that they saw the Defendant shooting, 4) within seconds after the shooting, Brenda Corder and Deon Starks were discovered wounded from gunshots, 5) casings from a .380 caliber handgun were found in the area called "the rails" where the Defendant was standing and 6) a .380 bullet was found in the body of Deon Starks. There was also evidence that the Defendant was shooting the gun into the air and not directly toward the occupants of the car -Weir, Wade and Clark. The jury could have reasonably inferred from this evidence that the Defendant shot and killed the two victims. The jury chose to accredit the circumstantial evidence presented in support of the State's theory. It was within the jury's prerogative to do so.

A rational trier of fact could have found the essential elements of the crime of second degree murder beyond a reasonable doubt. Defendant "knowingly" shot a gun while standing on a street, which the testimony showed was busy with people. Defendant was aware that he was shooting a gun

and that there were many people present on the street while he was shooting.  Defendant is not entitled to relief on this issue.

## II. Admissibility of Photographs

Defendant argues that the trial court erred in admitting the autopsy photographs of the victims.  Defendant contends that the autopsy photographs were inflammatory and prejudicial, and lacking in probative value.  Alternatively, Defendant asserts that the photographs were duplicitous, lessening the need for admitting all of the photographs.

Tenn. R. Evid. 403 governs the admissibility of photographs.  See also State v. Banks, 564 S.W.2d 947 (Tenn. 1978).  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ”  Tenn. R. Evid. 403.  The evidence must be relevant and its probative value must outweigh any prejudicial effect.  Banks, 564 S.W.2d at 950-51.  The trial court has complete discretion on whether to admit photographs and will not be reversed absent a clear showing of an abuse.  State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993)

Photographs of murder victims are "inherently prejudicial.”  Banks, 564 S.W.2d at 951.  Therefore, in Banks, our supreme court set forth the factors that are necessary in determining whether the inherently prejudicial character of the photographs outweighs their probative value.  These factors include: (1) the accuracy and clarity of the photographs; (2) whether they were taken before the corpse was moved, if the position and location of the body when found are material; (3) the inadequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.  Id.

We find no abuse of discretion by the trial court and hold that the photographs were properly admitted.  First, the autopsy photographs taken by Dr. Harlan were found accurate and clear representations of the bodies of Brenda Corder and Deon Starks.  Second, although the position and location of the bodies when found at the scene are material, this factor does not make the photographs now inadmissible.  Dr. Harlan testified during a jury-out examination that he needed photographs to assist him in explaining the autopsies.  Third, the photos helped to remove any inadequacy in Dr. Harlan’s testimony when relating the results of the autopsies.

Generally, where medical testimony adequately describes the degree or extent of the injury, gruesome and graphic photographs should not be admitted.  State v. Duncan, 698 S.W.2d 63 (Tenn. 1985), cert. denied, 475 U.S. 1031, 106 S. Ct. 1240, 89 L.Ed.2d 348 (1986).  However, Dr. Harlan used the photographs in question to assist in explaining and clarifying his testimony regarding the manner and cause of death for each victim.  See, e.g., State v. Stephenson, 878 S.W.2d 530, 542, reh’g denied, (Tenn. 1994); State v. Smith, 868 S.W.2d 561, 576 (Tenn. 1993), cert. denied, 513 U.S. 960, 115 S. Ct. 417, 130 L. Ed. 2d 333 (1994) (photographs used to illustrate witnesses' testimony admissible for this purpose).  The photographs were also used to show the location of the wounds, along with the entrance and exit points of the bullets.  See State v. Goad, 707 S.W.2d 846,

850 (Tenn. 1986) (photographs admissible for this purpose). The trial court held that as an expert, Dr. Harlan was entitled to have the best evidence obtainable while testifying. Such a finding did not constitute an abuse of discretion. The record reflects that Dr. Harlan only picked out the photos he needed during his testimony and the trial court excluded the remaining photographs. Relevant photographs will not be held inadmissible merely because they are cumulative or because the pictures can be described in words. State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994).

The four (4) photographs showing Deon Starks lying on his back were cumulative and perhaps duplicitous. Yet, we do not find that these photos were so shocking or inflammatory as to preclude their admission. Neither do we find that the admission of the photos was an abuse of discretion by the trial court.

Finally, the Defendant argues that the State did not need the photos "to establish a prima facie case of guilt or to rebut the defendant's contentions." We find that the photos were necessary to establish guilt and to rebut the Defendant's contentions. Here, the locations of the wounds were relevant to testimony regarding the distances between the victims and the Defendant at the time of the shooting. The locations of the wounds were also relevant to rebut the Defendant's contention that he was shooting in the air and could not have shot anyone on the street that night.

Lastly, and very important to our decision, we note that the autopsy photographs did not include views of the victims' bodies showing incisions normally made during autopsies. The pictures displayed conditions of the victims' bodies as they were shortly after death. Therefore, because the photographs were not overly shocking or horrifying, we find that any unfair prejudice did not outweigh the probative value of the photographs. The trial court did not abuse its discretion in admitting the autopsy photographs of the victims.

### III. Excessive Sentences

The Defendant's third issue is that the trial court erred in imposing excessive sentences that are contrary to the mandates of the Tennessee Criminal Sentencing Reform Act of 1989. We review sentences imposed by the trial court de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). The law conditions this presumption upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, arguments of counsel, the defendant's statements, the nature and character of the offense and the defendant's potential for rehabilitation. See Tenn. Code Ann. §§ 40-35-103(5), -210(b)(1997 & Supp.1999); Ashby, 823 S.W.2d at 169. Here there is no question that the trial court complied with the sentencing statutes.

In this case, the sentencing statutes restricted the trial court to sentencing the Defendant to not less than fifteen (15) years and no more than twenty-five (25) years as a standard, Range I, Class A felon. Tenn. Code Ann. § 40-35-112(a)(1). Tenn. Code Ann. § 40-35-210(c) (1997) sets the presumptive sentence for a Class A felony at the midpoint of the range, if there are no enhancement

or mitigating factors. Where one or more enhancement factors apply but no mitigating factors exist, the trial court may sentence above the presumptive sentence but still within the range. Id. § 40-35-210(d). Where both enhancement and mitigating factors apply, the trial court must start at the midpoint of the range, enhance the sentence within the range as appropriate to the enhancement factors and then reduce the sentence within the range as appropriate to the mitigating factors. Id. § 40-35-210(e). The weight afforded an enhancement or mitigating factor is left to the discretion of the trial court if the trial court complies with the purposes and principles of the Tennessee Criminal Sentencing Reform Act of 1989 and the record supports its findings. State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).

The Defendant asserts that the trial court improperly relied upon certain statutory enhancement factors provided in Tennessee Code Annotated section 40-35-114 (1997) and one non-statutory factor. After a sentencing hearing, the trial court found that there were no mitigating factors applicable to the present case. The Defendant also challenges that finding.

The trial court found the following five statutory enhancing factors applicable to the Defendant's convictions:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(3) The offense involved more than one (1) victim;

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high; and

(16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

Tenn. Code Ann. § 40-35-114 (1997). The Defendant does not challenge the trial court's application of the enhancing factors in Tenn. Code Ann. § 40-35-114(1) & (9).

First, the Defendant maintains that the trial court misapplied factor (3), "the offense involved more than one (1) victim." We have previously held that where a jury convicts a defendant separately for each victim, and each offense for which they convict the defendant only involved one victim, this enhancement factor will not apply. See State v. Freeman, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996). In the case sub judice, the jury convicted the Defendant separately for the murders of Brenda Corder and Deon Starks. Therefore, we find that the trial court erred in applying this factor.

Second, the Defendant argues that since enhancement factors (10) and (16) are inherent to second degree murder, the trial court should not have used these factors to enhance the Defendant's sentence. See State v. Belser, 945 S.W.2d 776 (Tenn. Crim. App. 1996); State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987). However, the proof at trial showed that other individuals were on the street and in the same direction in which the Defendant fired his gun. These facts display "a culpability distinct from and appreciably greater than that incident to the offense for which he was convicted." See State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994) ("Some activities by their very nature cause high risk to human life, for example, driving on a busy street under the influence of an intoxicant or firing a firearm into a crowd of people.").

In State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App. 1995), the Court held that the trial court incorrectly applied enhancement factor (16). In Bingham, the panel distinguished between enhancement factors (10) and (16) by noting that the risk to persons other than a victim of the convicted offense supported factor (10), but not factor (16). More recently, in State v. Charles Justin Osborne, No. 01C01-9806-CC-00246, 1999 WL 298220, at *1 (Tenn. Crim. App., Nashville, May 12, 1999) another panel of this Court held that ". . . the enhancement statute does not contemplate application of factor (16) based on risk to others." Id. at 3. The panel in Osborne looked to the language of Tenn. Code Ann. § 40-35-114(16) to find that "to a victim" refers to the victim of the charged offense, not potential victims. Id. Thus, the trial court erroneously applied enhancement factor (16) to this case. But cf. State v. Taylor, No. 03C01-9810-CR-00366, 1999 WL 692579, *6 (Tenn. Crim. App., Knoxville, Sept. 8, 1999), perm. to app. denied, March 6, 2000 (relying upon State v. Sims, 909 S.W.2d 46 (Tenn. Crim. App. 1995) to find both enhancement factor (10) and (16) applicable); State v. Wiggins, No. 01C01-9806-CR-00241, 1999 WL 447322, * (Tenn. Crim. App., Nashville, July 1, 1999) (majority of panel finding both enhancement factors (10) and (16) applicable, while rejecting Bingham); Sims, 909 S.W.2d at 50 (holding that like enhancement factor (10), factor (16) may be applied where persons other than the victim are in the area subject to injury).

We agree with the trial court's application of enhancement factor (10) based upon the risk to others in the area subject to injury. Brenda Corder and Deon Starks were the unfortunate victims of Defendant's crime; yet, the record shows that many potential victims were within the proximity of Defendant's gunfire. We further note that no bullet was found in the body of Brenda Corder. This leads to the inference that the bullet(s) which struck her in the back and hand could have caused injury to others. Also, only one bullet struck Deon Starks. The testimony adduced at trial showed that the Defendant fired as many as five shots. In sum, given the number of shots fired and the number of people within the line of fire, the facts justify the application of enhancement factor (10).

Third, Defendant contends that the trial court erroneously considered the Defendant's decision not to testify and his lack of open remorse as enhancement factors. Defendant argues that he has the constitutional right not to testify; therefore, the trial judge should not use his decision against him during sentencing. During the sentencing phase, the trial court stated the following:

Court: ". . And it bothers me that a man who would kill two people the way that the trial was set out, and then wouldn't get up here and tell the family he's sorry, that he wishes it hadn't happened, and to be remorseful on the sentencing

11

hearing. Because this is his life we're talking about. He chose not to do it. So, he's not remorseful. I find that he's not remorseful, he didn't do anything to help himself, and that's terrible. That's the reason I talked to him, I thought I'd give him a chance and make sure he understood and he does understand."

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Likewise, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Furthermore, it is well-settled that a trial court may not use non-statutory enhancement factors to enhance a defendant's sentence. See State v. Grissom, 956 S.W.2d 514, 518 (Tenn. Crim. App. 1997); State v. Strickland, 885 S.W.2d 85, 89 (Tenn. Crim. App. 1993). During the sentencing hearing, the trial court referred to the Defendant's failure to testify three times, including the one instance above. However, there is no indication that the trial judge used these factors to enhance Defendant's sentence. At no point did the trial court specifically state that it was enhancing Defendant's sentence because he failed to testify and showed a lack of remorse. Thus, we find no error in sentencing based upon this argument.

The trial court found no mitigating factors. We also agree that the record does not support the finding of any mitigating factors. Defendant argues the applicability of Tennessee Code Annotated section 40-35-113 (6) and (11). First, Defendant asserts that "because of youth, [he] lacked substantial judgment in committing the offense." See Tenn. Code Ann. § 40-35-113(6). The trial judge found that Defendant had a criminal history dating from the age of fourteen (14). The trial court also found that as a juvenile, the Defendant proved unwilling to comply with conditions of probated sentences. The evidence showed that Defendant was nineteen (19) at the time he committed these offenses. Defendant argues that firing a gun into the air and a crowded street is evidence of his level of maturity and mental development. Defendant further argues that his actions show a lack of substantial judgment due to his youth. From these facts, we think the trial court acted within its prerogative in determining that the defendant was sufficiently mature to understand the nature of his conduct. His familiarity with the criminal justice system and his several opportunities at rehabilitation before reaching the age of majority show a full appreciation for the seriousness of his acts. It is difficult under these circumstances to conclude that because of his youth, the defendant lacked "substantial judgment." The trial court properly rejected this factor.

Next, Defendant contends that he "committed the offense[s] under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." Tenn. Code Ann. § 40-35-113(11) (1997). We do not agree that the record here supports the finding of this mitigating factor, as there were no unusual circumstances that would cause this mitigating factor to be applicable. Accordingly, the trial court properly rejected Defendant's proposed mitigating factors.

We note that while the Defendant does not challenge the trial court's application of enhancement factor (1), we find that the trial court erroneously applied factor (1) to Defendant's

12

juvenile convictions. The presentence report showed that before reaching the age of majority the Defendant accumulated a juvenile record consisting of a conviction for theft of a motorcycle, several violations of probation, failures to appear, driving without a license, testing positive for cocaine, possession of a firearm, truancy and sale of a controlled substance (cocaine). One of these offenses, if committed by an adult, would have constituted a felony, i.e., sale of a controlled substance.

In 1995, the Tennessee Legislature amended Tenn. Code Ann. § 40-35-114 to include enhancement factor (20). Factor (20) allows for enhancement of a sentence if "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-114(20) (1997). For offenses committed after July 1, 1995, juvenile adjudications may only be considered if they qualify under Tenn. Code Ann. § 40-35-114(20). See State v. Ronald Shipley, No. 02C01-9601-CR-00031, 1997 WL 21190, at *7 n. 1 (Tenn. Crim. App., Jackson, Jan. 22, 1997); State v. Timothy Adams, No. 02C01-9512-CC-00376, 1997 WL 1821, at *4 n. 4 (Tenn. Crim. App., Jackson, Jan. 3, 1997). So, enhancement factor (20) addresses juvenile convictions, while factor (1) focuses on adult convictions. Thus, the two factors focus on mutually exclusive instances of conduct. See State v. Jeffrey A. Burns, No. M1999-00873-CCA-R3-CD, 2000 WL 711148, at *5 (Tenn. Crim. App., Nashville, June 2, 2000); State v. Brent Brown, No. 02C01-9710-CC-00419, 1998 WL 742350, at *2 (Tenn. Crim. App., Jackson, Oct. 26, 1998) (factor (20) is "the exclusive factor for enhancing a sentence based on a defendant's juvenile record").

The Defendant committed the present offenses after July 1, 1995. Therefore, Tenn. Code Ann. § 40-35-114 (20) is applicable to Defendant's conviction for the sale of a controlled substance (cocaine). We are unable to glean from the presentence report whether the theft of a motorcycle conviction was a felony or a misdemeanor; therefore, the theft cannot be considered under factor (20). However, this does not affect the application of factor (20) in this case. Neither factor (20) nor factor (1) may be applied to the Defendant's remaining juvenile convictions, as they fail to meet the requirements of Tenn. Code Ann. §§ 40-35-114 (1) and (20). Thus, the trial court erred when it failed to apply factor (20) to the Defendant's juvenile conviction for sale of a controlled substance. Likewise, the trial court misapplied enhancement factor (1) to Defendant's record of juvenile convictions.

However, enhancement factor (1) is applicable to Defendant's adult criminal convictions and criminal behavior. Tenn. Code Ann. § 40-35-114(1). The presentence report disclosed two misdemeanor adult convictions from 1997 for failure to appear and driving while his license was suspended. Thus, the trial court correctly applied enhancement factor (1) this case.

Summarily, we find that the trial court improperly applied enhancement factors (3) and (16); however, a finding that enhancement factors were erroneously applied does not equate to a reduction in the sentence. State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994). Also, we find no applicable mitigating factors. The record supports the trial court's application of the enhancement factors provided in Tenn. Code Ann. § 40-35-114 (a) (1), (9), (10) and (20), which more than justify the imposed sentence. A trial court has discretion in the weight to give each enhancement factor, based upon the "severity of the offense and the culpability of the offenders within the ranges of

13

penalties set by the legislature." Jones, 883 S.W.2d at 601. Furthermore, the court has the discretion to weigh any factor heavily. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996).

Here, the misdemeanor convictions under enhancement factor (1) were not entitled to much weight. However, the Defendant used a firearm, a factor to which the trial court correctly gave substantial weight under the circumstances of this case. See Tenn. Code Ann. § 40-35-114 (9). As noted above, the Defendant also committed these offenses when the risk to human life was great and the trial court was entitled to give weight to this factor. See Tenn. Code Ann. § 40-35-114 (10). Therefore, we affirm the twenty-five (25) year sentence imposed by the trial court for each conviction of second degree murder.

## IV. Consecutive Sentences

Defendant next challenges the trial court's imposition of consecutive sentences. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated Section 40-35-115(b) exist. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that the defendant is (1) a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood, or (2) an offender whose record of criminal activities is extensive. Tenn. Code Ann. § 40-35-115(b)(1) & (2) (1997). Here, the trial judge found both factors and ordered consecutive sentencing.

Defendant contends that his juvenile record is insufficient to support a finding that he is a professional criminal. In his brief, Defendant relies upon the case of State v. Blouvet, in which this Court upheld a trial court's imposition of concurrent sentences, instead of consecutive sentences. State v. Blouvet, 965 S.W.2d 489 (Tenn. Crim. App. 1997). In Blouvet, the trial court found that while the defendant had an extensive juvenile record and had been convicted of three felonies, the defendant had not become a professional criminal. Id. at 495. This court upheld the trial court's decision.

Here, Defendant argues that because his juvenile history is less extensive than that of the defendant in Blouvet, the trial court should have ordered his sentences to run concurrently. However, in Blouvet, we found that it was "quite possible that the defendant's history could have supported the imposition of consecutive sentences." Blouvet, 965 S.W.2d at 495. Yet, we could not find "that the trial court abused its discretion in ordering the sentences to be served concurrently." Id. However, there is no proof in this record that the Defendant was a professional criminal who knowingly devoted himself to criminal acts as a major source of livelihood. Nevertheless, it only takes the finding of one applicable factor to justify consecutive sentences.

The trial court has sole discretion to decide whether a defendant should serve concurrent or consecutive sentences. Adams, 973 S.W.2d at 230; State v. James, 688 S.W.2d 463 (Tenn. Crim. App. 1984). This discretion remains coupled with the obligation to follow the sentencing guidelines. State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. Crim. App. 1995). In this case, the trial court found Defendant's juvenile history to be extensive, compared to most people his age. The trial court

14

heard evidence regarding Defendant's criminal background, which included: theft, driving without a license, violation of probation, sale of a controlled substance (cocaine), aggravated assault, violation of DYD aftercare and cocaine usage. The Defendant's juvenile record justified the trial court's determination that Defendant's criminal history was extensive. Moreover, it is important to note that while all of Defendant's juvenile convictions could not be used to enhance his sentence under enhancement factor (20), we do not find that the trial court abused its discretion in using Defendant's juvenile record to order consecutive sentencing. Tenn. Code Ann. § 40-35-115(b) states that the trial court "may," rather than must, impose consecutive sentencing if one or more of the enumerated factors is present. Thus, we find that the Defendant has failed to carry his burden of proving that the consecutive sentencing was improper. Defendant is not entitled to relief on this issue.

After a careful consideration of the evidence presented at both the trial and sentencing hearing and the nature of Defendant's criminal conduct, we find that a combined sentence of fifty years is appropriate and supported by the record. This sentence is ". . . no greater than that deserved for the offense committed" and it is " . . . the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2) & (4).

For the foregoing reasons, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
ASSIGNED ON BRIEFS JULY 18, 2000

## STATE OF TENNESSEE v. REGINALD TYRONE DONNELL

**Circuit Court for Wilson County
Nos. 97-1308, 97-1309**

---

**No. M1999-02184-CCA-R3-CD**

---

### JUDGMENT

Came the Appellant, Reginald Tyrone Donnell, by and through counsel, and also came the Attorney General on behalf of the State, and this case was heard on the record on appeal from the Criminal Court of Wilson County; and upon consideration thereof, this court is of the opinion that there is no reversible error in the judgment of the trial court.

It is, therefore, ordered and adjudged by this court that the judgment of the trial court is affirmed, and the case is remanded to the Criminal Court of Wilson County for execution of the judgment of that court and for collection of costs accrued below.

Because it appears to the court that the Appellant, Reginald Tyrone Donnell, is indigent, costs will be paid by the State of Tennessee.

**PER CURIAM**
Thomas T. Woodall, Judge
David G. Hayes, Judge
Norma McGee Ogle, Judge